James L. LANG, Mary L. Lang and Margaret Lang, Plaintiffs,

v.

BRAINTREE SCHOOL COMMITTEE, Dr. Gregory Anrig, Massachusetts Commissioner of Education, Defendants.

No. CA 79-1873-T.

United States District Court, D. Massachusetts.

Aug. 27, 1982.

Anne M. Vohl, Burlington, Mass., for plaintiffs.

Carolyn Wood, Boston, Mass., for Com'r Anrig.

Paul A. Schneiders, Sp. Counsel, Canton, Mass., Arthur A. Smith, Jr., Town Counsel, Braintree, Mass., for Braintree School Committee.

John P. Davey, Boston, Mass., for town of Braintree.

## OPINION

TAURO, District Judge.

█ Plaintiffs Margaret Lang and her parents, James and Mary Lang, brought this action under 20 U.S.C. § 1415(e)[1] challenging the Individual Education Program ("IEP") developed for Margaret by the Braintree School Committee (Braintree) and approved by the Massachusetts Bureau of Special Education Appeals (the Bureau) on June 7, 1979.[2] The IEP in question was developed in a series of steps, some of which included active participation by the Langs, culminating in a hearing before the Bureau in April 1979. The IEP approved by the Bureau provides for Margaret's education in a public school setting with special education components, most notably a special education classroom with qualified special education teachers, speech and physical therapy, art, music, physical education and other non-academic subjects, and a special summer program. Plaintiffs contend that the IEP, in addition to being procedurally defective,[3] does not provide Margaret with a "free appropriate public education" within the meaning of 20 U.S.C. § 1412. They maintain that Braintree should be required to pay for Margaret's continued placement at St. Coletta Day School (St. Coletta's) a private school (with a year-round program) which Margaret has been attending since January 1971.[4] Defendants, Braintree and the Bureau, argue that the IEP does provide for an appropriate education for Margaret, that it is grounded in sound educational theory, and that it will in fact provide greater benefit to Margaret than the St. Coletta's placement because it entails a less restrictive setting and greater opportunity to interact with children with similar or somewhat superior skills.[5] This court is therefore called upon to determine whether Braintree is offering, in its IEP, an appropriate public education for Margaret, and

1. This section is part of the Education for All Handicapped Act (the "Act"), 20 U.S.C. § 1401 et seq.

2. The Bureau's decision was affirmed by the State Advisory Commission for Special Education on July 10, 1979.

3. Plaintiffs aver, and defendants do not dispute, that Braintree initially prepared a temporary, "diagnostic" IEP, which was rejected by Mr. and Mrs. Lang, and supplemented by two addenda prepared by Braintree without the knowledge or cooperation of the parents. The importance of involving parents in the development of an educational program for their children cannot be overstated. *Board of Education of the Hendrick Hudson Central School District Board of Education, Westchester Co. v. Rowley,* —— U.S. ——, —— n.6, 102 S.Ct. 3034, 3038 n.6, 73 L.Ed.2d 690 (1982). Defendants argue, however, that the procedural defect was "cured" by the parents' involvement in the hearing process, in which the Bureau, through its hearing officer, held that the diagnostic IEP, with the two addenda, did comprise an ade-

quate long-range IEP. This court cannot agree, however, that the school committee or the state may comply with the procedural requirements of the Act by including the parents only in the initial and penultimate steps of the planning process. Unless they are invited to participate in all significant decisions made by the school, the statutory deference to state and local decision-making in the educational field would not be justified.

4. On April 15, 1980, this court allowed plaintiffs' motion for a temporary order directing Braintree to continue to fund Margaret's placement at St. Coletta's pending the outcome of this proceeding. Braintree now seeks reimbursement of the amount spent in complying with this court's order. Plaintiff and the Bureau oppose this request.

5. The court notes, in this connection, the Act's clear preference for "mainstreaming" where appropriate. *Rowley, supra,* —— U.S. at ——, 102 S.Ct. at 3049.

what effect any procedural irregularities in the development of the IEP might have on this court's decision on the merits.[6] For the reasons stated herein, the court finds that while defendants had the burden of proving that the education offered is appropriate, that burden has been met here.

### Factual Background

Margaret Lang is now eighteen years old. She has been diagnosed as mentally retarded, mentally ill, and epileptic, and she is seizure prone. When she started kindergarten her family lived in Dorchester, which is part of the Boston public school system. She spent one year in private kindergarten, at the expense of the Boston School Department, and then was admitted to a second year in public kindergarten. During her second year of kindergarten she spent some time out of school because of her grandfather's death, and her teacher, to whom she was emotionally attached, was replaced with a new, less experienced one. Margaret had great difficulty adjusting to the change, and ceased progressing academically. When she started first grade, the Boston School Department determined that she was in need of special classes, and by the end of first grade determined that she was in need of special schooling. Boston subsequently provided funding for Margaret to attend St. Coletta Day School. For the next eight years her seizure activity intensified despite medication, and only gradually was she able to learn to relate to the teachers and other children there.

In December of 1977 the Langs moved to Braintree and requested that the Braintree School Committee assume financial responsibility for Margaret's placement at St. Coletta's. Braintree did an assessment of Margaret and developed an eight-week educational program, which it planned to replace with a more permanent IEP. It refused to continue funding St. Coletta's, because it believed it was offering, in the Braintree public school, an appropriate edu-

cation within the meaning of Massachusetts and federal law.

The eight-week plan was developed in February 1978, in preparation for the 1978–79 school year. However, Mr. and Mrs. Lang rejected the plan, and two addenda were developed by Braintree (one undated, one in October of 1978). The state attempted to mediate the dispute between Braintree and the Langs, and, when its efforts proved unsuccessful, convened a hearing in April 1979. The hearing officer issued an opinion finding the eight-week plan per se inappropriate, but held that an expanded program based on the original diagnostic plan and the addenda did set forth an appropriate educational plan less restrictive than St. Coletta's program.

### Plaintiffs' Contentions

Plaintiffs argue that the Braintree program cannot offer Margaret an appropriate education for two primary reasons: 1) although Braintree's program is basically satisfactory, the change from St. Coletta's to any other school would be psychologically and developmentally devastating, and 2) the Braintree program poses a threat to Margaret's physical safety because the school has numerous stairways which she would have to utilize frequently. Plaintiffs also argue that 3) the IEP is procedurally defective because the addenda were prepared without consulting the Langs, 4) the transitions inherent *in* the Braintree program (e.g., academic year to summer; junior to senior high school) would be harmful to Margaret, 5) the Braintree program, while good on paper, would not necessarily be carried out effectively.

Defendants respond that the change from St. Coletta's to the Braintree program would not be nearly as devastating as plaintiffs predict, and that Braintree offers a less restrictive but equally appropriate (and hence a superior) program to St. Coletta's. They also assert that while Braintree's program does involve use of the stairways, St.

---

**6.** 20 U.S.C. § 1415(e)(2) directs district courts to "hear additional evidence at the request of a party" who wishes to supplement the administrative record. The parties chose not to present additional evidence in this case.

Coletta's does too, and in fact that the Langs' own home has stairs that Margaret must negotiate daily.

At the administrative hearing plaintiffs' attorney appeared to concede that Braintree was offering a "fine program."[7] Mr. Lang's testimony indicates that he thought the program Braintree was offering was good "on paper," and was in fact almost identical to St. Coletta's program.[8] He believed, however, that not only would the change from St. Coletta's be harmful, but also that the written program would not be properly effectuated. Mr. Lang was not able to say what caused him to believe that the program would not be properly implemented, though he speculated that there might be an excess of discipline.[9] For its part, Braintree also conceded that the St. Coletta program is a good one for Margaret,[10] though it believed its program to be equally adequate and less restrictive.

Two experts, and a number of faculty members from each school, testified at the administrative hearing. Dr. Kuniholm, a psychiatrist who met with Margaret, her parents and her teachers, and who observed Margaret in school, testified that while the Braintree program was a good one, a transfer to the Braintree school could result in "a rather severe psychotic regression which might even be irreversible."[11] He felt quite confident about his prognosis despite his brief relationship with Margaret because it "[was] a rather obvious situation.

It [was] not a subtle or difficult diagnostic situation . . . ."[12]

Dr. Rosenberger, a child neurologist at Massachusetts General Hospital, had treated Margaret for four years at the time of the hearing.[13] He testified that Margaret has good seizure control (about 2–3 seizures per month) as a result of medication,[14] and that she is capable of going up and down stairs by herself.[15] Dr. Rosenberger had serious reservations about whether Margaret would get an appropriate education in the public schools.[16] But he also said that he could not determine what education program was best for Margaret,[17] and that it might be advantageous to her to be in a class in which some of the students were more advanced than she.[18] Most significantly, he seemed to suggest that the harm from the move itself, while potentially significant, would be comparable to that of any child who changed school after eight years.[19] In fact, his "chief concern" regarding Margaret's adapting to the Braintree school was the impact of the Langs' dissatisfaction with the switch.[20]

Several staff members from St. Coletta's testified that they thought the Braintree school would be physically hazardous,[21] and that the move itself could be quite damaging.[22] They believed that Margaret might feel out of place, and hence humiliated, in the public school.[23] But they also acknowledged that seizure control was difficult even at St. Coletta's,[24] that Margaret must

7. Transcript of the Administrative Hearing (hereinafter "Tr.") p. 115.

8. Tr. pp. 26, 33.

9. Tr. p. 19.

10. Tr. p. 52.

11. Tr. p. 6.

12. *Id.*

13. Tr. p. 60.

14. Tr. p. 66.

15. Tr. p. 65; Exh. 26.

16. Tr. pp. 67, 68.

17. Tr. p. 69.

18. Tr. p. 68.

19. Tr. p. 69.

20. Tr. p. 73.

21. *See* Cannon testimony, tr. at p. 79; testimony of Sister Peggy, tr. at p. 39; and Hansen testimony, tr. at p. 54.

22. Cannon testimony, tr. at 81; testimony of Sister Peggy, tr. at 48.

23. Hansen testimony, tr. at 53, Conover testimony, tr. at 56.

24. Tr. p. 41.

deal with stairways at home and at St. Coletta's,[25] and that Braintree's seizure contingency plan was workable.[26] The Braintree school's nurse, who had previously worked at St. Coletta's and knew Margaret there, believed that the change to the Braintree school would not be devastating, and that there were significant potential benefits to changing.[27]

Defendants' main witnesses were Mr. Malloy, Braintree's Special Needs Administrator, and Ms. Dowd, a special needs teacher in the Braintree schools. Mr. Malloy stated that the impact of the change would depend on how it was handled by the Langs, and that the trauma might be comparable to that experienced by a "normal" child changing schools.[28] He admitted that Braintree could not offer continuity between school and summer programs but could from summer to summer. Ms. Dowd testified that the mental abilities of her class were comparable to Margaret's, that she considers herself able to handle Margaret's intellectual level, and that she uses positive behavior modification methods.[29] She also believed that limited interactions with "normal" children would be beneficial to Margaret.[30]

### Statutory Scheme

20 U.S.C. § 1415(e)(2) provides that any party aggrieved by the decision of a State agency may bring an action in federal district court, regardless of the amount in controversy. The court is to receive the administrative record, hear additional evidence if a party so requests, "and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Thus while a trial de novo is not called for, the court has some latitude in reviewing the decision of the State hearing officer. The statute does

not spell out who has the burden of proof, however.

Section 1415(e)(3) states that during the pendency of these proceedings, unless the State or local agency and the parents otherwise agree, the child shall remain in her current placement. If she is seeking initial admission to public school and her parents agree, she shall be placed there.[31]

The standards for determining what relief is appropriate are also found in the statute. In order to be eligible for financial assistance in this federal-state cooperative program, the State must, *inter alia*, assure that "a free appropriate public education will be available for all handicapped children" within certain applicable age limits. 20 U.S.C. § 1412(2)(B). A "free appropriate public education" includes special education and related services provided at public expense. These must meet State education standards, include appropriate education, and be provided in conformity with a properly developed IEP. 20 U.S.C. § 1401(18). An IEP is a written statement formulated in a meeting between educators and parents which details the child's current performance, annual goals, services to be provided, projected duration, and criteria for and methods of evaluating her progress. 20 U.S.C. § 1401(19). "Special education" is defined as "specially designed instruction ... to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16).

### Analysis

In order to resolve this case, the court must address itself to three central issues: 1) what is meant by an "appropriate educa-

**25.** Tr. p. 78.

**26.** Tr. p. 48.

**27.** Tr. pp. 128–129. She appeared to be the only witness who had significant knowledge of both programs.

**28.** Tr. p. 93.

**29.** Tr. p. 113.

**30.** Tr. pp. 114–115.

**31.** This section was the basis for the court's decision requiring Braintree to continue funding the St. Coletta's placement pending the outcome of these proceedings.

tion"? 2) who should have the burden of proving that the IEP developed by Braintree is or is not adequate to assure an "appropriate education"? and 3) if Braintree prevails, should it be entitled to reimbursement for funds expended to maintain Margaret in St. Coletta's pursuant to this court's order of April 15, 1980?

In *Board of Education of the Hendrick Hudson Central School District Board of Education, Westchester Co. v. Rowley,* — U.S. —, —, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982), the Supreme Court held that the Act requires that participating States

> provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.

The Court rejected the holding of the court of appeals and the district court that States must provide an education which gives the student " 'an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children.' " *Id.* at —, 102 S.Ct. at 3040 (quoting the district court opinion, 483 F.Supp. 528, 534). *Rowley* thus provides significant guidance in determining whether Braintree is offering Margaret a "free appropriate public education" within the meaning of the Act, and, indirectly, on where the burden of proof lies.

The Court in *Rowley, supra* — U.S. at — - —, 102 S.Ct. at 3051, warned that courts must be careful to avoid

> imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

Thus, where the State is providing the child with an education that is of some benefit to her and is utilizing a minimally acceptable educational approach this court may not interfere. While the Act makes clear a preference for mainstreaming wherever appropriate, *id.* at —, 102 S.Ct. at 3045, the Supreme Court's analysis heavily emphasizes the Act's main purpose to assure that handicapped children receive *some* beneficial education at public expense, instead of remaining at home or in institutions without any educational experience whatsoever.

At the same time the Court recognized the stringent procedural requirements imposed on the States, and the importance of procedural compliance for assuring that a child's educational needs are met.

> Entrusting a child's education to state and local agencies does not leave the child without protection. Congress sought to protect individual children by providing for parental involvement in the development of State plans and policies ... and in the formation of the child's individual education program.... As this very case demonstrates, parents and guardians will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the Act.

*Id.* at —, 102 S.Ct. at 3052. Included among the procedural requirements is one that parents "be present when the child's IEP is formulated." *Id.* at —, n.6, 102 S.Ct. at 3038, n.6.

The Supreme Court's decision in *Rowley,* while it provides insight into what is meant by a "free appropriate public education," does not automatically resolve the issue facing this court. Unlike the Rowleys, plaintiffs here maintain that the program offered by the public school will actually be harmful to Margaret, and in any event will not "benefit" her. In *Rowley* it was not disputed that the school district's educational plan would benefit the child; the question was whether the district was required to provide an education which would allow her to achieve her potential to a degree commensurate with other, "normal" children.

**1228**

■ On the other hand, *Rowley* does make clear the importance of adhering to the procedural requirements of the Act. Though Braintree and the Bureau argue that the failure to include the Langs in the development of a long-range IEP was "cured" by their participation in the administrative hearing, the Act's requirements were clearly violated. Under these circumstances, and given the seeming preference in the Act for maintaining the status quo where the child is already receiving an appropriate education,[32] the burden must rest with the defendants to show, by a preponderance of the evidence, that Braintree's IEP provides Margaret with a "free appropriate public education."

■ The court finds, however, that defendants have met that burden here. Braintree is clearly offering Margaret an educational program designed to benefit her, and numerous professionals testified that this program embodies sound educational thinking. It is clear to the court that the safety hazards intrinsic in the Braintree program are no greater than those existing in the St. Coletta program or, in fact, in the Langs' home. That the Braintree program would expose Margaret to other students who are "normal" or who have greater skills in some areas does not undermine its appropriateness. On the contrary, there is every reason to believe, that Margaret's placement in a public school setting, with the proper special education and support services, would be of greater benefit to her than remaining in a private school setting. The court gives particular credence to the testimony of Braintree's school nurse, the only witness who is personally familiar with both programs, and to Dr. Rosenberger, who treated Margaret for several years and is acquainted with the Langs. Their testimony strongly suggests that at least at this point in her life, Margaret will benefit more from the program Braintree offers through its IEP than from the St. Coletta's program. While the change from St. Coletta's to Braintree might be a difficult one, the court does not view it as devastating, as plaintiffs suggest. Inasmuch as the Braintree IEP relies on legitimate educational philosophy akin to the mainstreaming approach preferred by the Act, and will provide to Margaret what this court views as an education that benefits her within the meaning of the Act, the IEP must be deemed satisfactory under the Act.

*Reimbursement by Plaintiffs*

■ Braintree seeks reimbursement from plaintiffs for the amounts it expended for Margaret's placement at St. Coletta's pursuant to this court's order of April 15, 1980.[33] While reimbursement might in some cases be available, *cf. Town of Burlington v. Department of Education of Massachusetts,* 655 F.2d 428 (1st Cir. 1981) (town paying for child's private placement pursuant to order of State Department of Education not entitled to preliminary injunction pending outcome of district court proceedings because reimbursement would be available later), the court does not believe it is appropriate here. Braintree failed to include the Langs in several crucial steps in the planning process, and thus denied them the opportunity to present information, ideas, and arguments that might have led to an interim, or even long-range, program satisfactory to both sides. Given the significant procedural defects in the development of the IEP, and the fact that Margaret remained in a setting which Braintree concedes offered her a beneficial educational and social experience, the Langs should not be required to reimburse Braintree for the amounts expended to keep Margaret at St. Coletta's.

Accordingly, the plaintiffs' request that the decision of the Massachusetts Department of Education be set aside is denied. Braintree's request that plaintiffs be ordered to reimburse it for any tuition and transportation payments made to any private institutions or companies on Margaret's behalf is also denied.

An ORDER will issue.

**32.** *See* 20 U.S.C. § 1415(e)(3), and page 1226 *supra.*

**33.** *See* note 4 and p. 1223, *supra.*