**SCITUATE SCHOOL COMMITTEE and the Town of Scituate, Rhode Island**

v.

**ROBERT B., Judith B., and Todd B.**

**Civ. A. No. 83–0333.**

United States District Court,
D. Rhode Island.

Oct. 22, 1985.

Edmund Alves, Jr., Providence, R.I., for plaintiffs.

Marguerite Dolan, Turners Fall, Mass., H. Francis Kleiner, Providence, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

This is an appeal by the Scituate School Committee and the Town of Scituate from an adverse ruling by a review officer of the Rhode Island Department of Education. The appeal is brought pursuant to § 615(e)(2) of the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. § 1415(e)(2). The dispute revolves around the education of Todd B., a learning disabled teenager.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Facts*

Todd B. and his parents are residents of Scituate R.I. At age 6, Todd entered the Scituate school system; he attended kindergarden at Clayville Elementary School during the 1973–74 school year, and first grade at the same school during 1974–75. He received remedial assistance in reading during first grade. In September of 1975, Todd's parents removed him from the Scituate school system and placed him in the Cranston-Johnston Catholic Regional School, where he remained through the first half of third grade. While at the school he received tutoring from a volunteer in both reading and language. In March 1976, at Mrs. B's request, Todd was evaluated by Claire Tuttle, a school psychologist with the Scituate School Department and Dr. Alan Berman, a clinical psychologist affiliated with the University of Rhode Island. Both experts agreed that Todd was learning disabled.

In December 1976, Todd's parents conferred with the Scituate Special Education Director and discussed Todd's reading problems. Todd was placed at Hope Elementary School (part of the Scituate public school system) since full and part time learning disability teachers were available to him there. Todd entered the second half

of the third grade in January of 1977. He repeated the third grade at the same school during 1977–78.

An Individual Education Program (IEP) conference was held on April 3, 1978, to review Todd's IEP and to plan his program for the 1978–79 school year. Mrs. B. agreed to the school officials' proposal to have Todd continue at Hope Elementary with resource assistance. Todd's reading ability had been tested by a Scituate reading specialist in January of 1977, when he re-entered the school system, and was re-tested in May of 1978. The results indicated that Todd was reading at pre-primer level when he came to Hope and that by May of 1978 he was reading at the first grade, second month level.

Although Mrs. B. agreed to the 1978–79 IEP developed for Todd in April 1978, she changed her mind in May and informed Scituate officials that she was placing Todd, along with his two brothers, at the Gordon School, a private day school. Todd never returned to the Scituate school system. In September 1980, Todd's parents enrolled him in a residence program at the Linden Hill School in Northfield Massachusetts, a private school specializing in education of learning disabled boys. The initial placement was at the private expense of the parents and they do not seek reimbursement for that year's tuition. The Scituate School Department was not consulted concerning the decision to enroll Todd at Linden Hill.

B. *Procedural History*

In April 1981, Todd's parents applied to the Northwest Special Education Region for financial assistance for Todd's placement at Linden Hill for the upcoming 1981–82 school year. During the application process, Mrs. B. expressed a number of negative feelings relative to her experience with and confidence in the services available in Scituate.

On May 5 and May 12, 1981, the special education multi-disciplinary team (MDT) met to discuss Todd's case. The MDT concluded that new evaluations would be required to determine what services were most appropriate for Todd. In the MDT's opinion, prior test results were flawed or too dated. Mrs. B. objected to further testing of her son and withheld consent until June 16, 1981, the date of the last scheduled MDT meeting. The signed consent form was received by the School Department on June 18, 1981. A psychological evaluation and a partial educational evaluation of Todd were conducted on June 22, 1981. Repeated attempts were made in June and July to complete the evaluations, but these attempts were stymied by parental resistance.

In September of 1981, Todd began his second year at Linden Hill. When school opened in Scituate, Todd's mother was notified that the MDT would meet with her on September 15, 1981, to discuss Todd's evaluations. At that meeting the evaluators were present and they reviewed their reports. Todd's mother expressed her dissatisfaction with the Scituate School's past education of her son. Mrs. B. was advised that the MDT was recommending placement in the Scituate self-contained classroom. She objected and suggested that the members of the MDT visit Linden Hill to observe Todd before holding the IEP conference. The Scituate Special Education Director, Robert DeMagistris, visited Linden Hill on September 29. On October 5, he wrote to the Headmaster of Linden Hill inviting the school's staff to participate in Todd's upcoming IEP meeting.

On October 8, Todd's mother agreed that the IEP meeting could be scheduled for October 20. The Linden Hill Headmaster was sent notice of the scheduled date for the conference and was invited to attend and share input into the development of the program. No response was received to this letter or to a follow-up one sent to Linden Hill a week later.

The IEP meeting was held, as scheduled, on October 20, 1981. Mrs. B. was accompanied by her attorney. After the meeting, Todd's mother decided to take the proposed IEP home to review it in more detail, and she agreed to respond to the plan within 5

days as required by the Rhode Island Regulations. On October 23, Mrs. B., through her attorney, requested an extension of time until November 5, to respond to the recommendations in the proposed IEP. On November 5 the IEP was returned, without suggestions, comments or questions. When Mrs. B. was contacted, on November 9, to see if she would be responding to the IEP, she informed the school that she would be in touch through her attorney.

On December 11, 1981, Mrs. B.'s attorney wrote to the Scituate Superintendent of Schools and demanded a due process hearing relative to the proposed IEP. A hearing officer was appointed on December 15, 1981. The hearing took place on September 1 and 2, 1982. On January 28, 1983, the hearing officer rendered a decision favorable to the school department on all issues.

During the pendency of the hearing process, Todd's parents placed him at the Forman School in Connecticut. Todd was no longer eligible to attend Linden Hill as he had completed the program. Mrs. B. did not consult the Scituate School Department prior to choosing a new school for her son.

The parents appealed the Hearing Officer's decision to the Commissioner of Education on February 28, 1983. On March 7 a review officer was appointed and written arguments were submitted to the officer on or about April 1, 1983. On April 29, the review officer rendered a decision reversing the hearing officer, in favor or the parents. Scituate is here appealing the decision of the review officer.

## II. DISCUSSION

### A. *Overview of Issues Raised and Proper Role of this Court*

■ The EAHCA provides for *de novo* review by the courts after exhaustion of administrative processes. The statute mandates that "the court shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate." 20 U.S.C. § 1415(e)(2). The Court's role in EAHCA proceedings is to assess the evidence independently, not to affirm or reverse administrative decisions or to remand with instructions. *Kruelle v. New Castle City School District*, 642 F.2d 687, 692 (3rd Cir.1981); *Anderson v. Thompson*, 495 F.Supp. 1256, 1260–61 (E.D.Wis.1980), *aff'd on other grounds*, 658 F.2d 1205 (7th Cir. 1981). Although the role of the Court is to make an independent determination, this Court may properly consider the opinions of the state and local hearing officers, especially in making factual determinations requiring specialized knowledge. In such instances courts may feel less inclined to substitute their judgment for the conclusion of specially trained hearing examiners. Bazelon, *Implementing the Right to Treatment*, 36 U.Chi.L.Rev. 742, 744 (1969). In fashioning remedies, this court is empowered to order "such relief as [it deems] appropriate." 20 U.S.C. § 1415(e)(2).

A court's inquiry in suits brought under § 1415(e)(2) is twofold. "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (footnotes omitted).

I have reviewed all the transcripts, exhibits, correspondence, and numerous briefs pertaining to this case and have determined that the relevant legal issues are:

I. Did the Scituate School Department commit procedural errors during the IEP formulation process, and if so, what is the legal effect of these procedural deficiencies?

II. Was the proposed IEP adequate? (*i.e.* did the IEP meet the applicable state and federal standards and did Scituate edu-

cation officials have an acceptable level of understanding about Todd's disability?)

III. Are the parents entitled to reimbursement for tuition paid since the development of the rejected IEP, and may they recover the costs of attorney's fees? Each of these issues is addressed in turn.

### I. Procedural Considerations

The review officer's reversal of the hearing officer's decision was based on two particular procedural errors he believed Scituate to have committed. The review officer found that the legal effect of these two errors was to invalidate the IEP that was formulated on October 2. On this basis, the review officer found for the parents and declined to rule on the substance of the IEP.

The two purported procedural flaws, deemed by the review officer to be fatal to Scituate's case were that:

1. the notice to Todd's parents about the IEP meeting did not state who would be in attendance or that other individuals could attend the meeting, and

2. the parents were denied the opportunity to meaningfully participate in the formulation and development of the IEP.

### 1. Insufficient Notice

 The Regulations of the Rhode Island Board of Regents for Education (hereinafter R.I.Regs) Section One, V. 4.1.2.3.3 require that "notice of the [IEP] meeting must indicate the purpose, time, and location of the meeting and specify who will be in attendance. It should also notify the parent that other individuals may attend at the discretion of the parent or agency." The U.S. Department of Education reinforced the requirement that parents must be notified of who will be in attendance at the IEP meeting at *Education for the Handicapped Law Report*, Supplement 41, February 6, 1981, p. 103:52, which reads:

**1.** Although under the facts of this particular case, I find that the procedural errors with the notification process do not necessitate invalidation of the IEP, I make no blanket determination as to the adequacy of the current "Notice of

### 28. MUST THE PUBLIC AGENCY LET THE PARENTS KNOW WHO WILL BE AT THE IEP MEETING?

Yes. In notifying parents about the meeting, the agency "must indicate the purpose, time, and location of the meeting, and WHO WILL BE IN ATTENDANCE." (Reg. 300.345(b), emphasis added.) Where possible, the agency should give the name and position of each person who will attend. In addition, the agency should inform the parents of their right to bring other participants to the meeting ... It is also appropriate for the agency to ask whether the parents intend to bring a participant to the meeting.

The notice to Todd's parents of the IEP meeting (School Exhibit (S)–6) clearly did not satisfy the requirements of the federal and Rhode Island regulations. The notice form, dated October 13, 1981, does not specify who will be in attendance at the IEP meeting and does not mention that other individuals may attend. Additionally, the notice does not "indicate the purpose" of the meeting; it merely informs the parents that such a meeting is scheduled.

Despite the procedural infirmities with Scituate's notification process, I hold that in this particular instance,[1] the defects do not necessitate invalidation of the IEP. The purpose of the regulation is to insure that parents of handicapped children are given the fullest opportunity possible to provide input into the development of their child's IEP. The facts of this case are such that the spirit of the regulation was satisfied and the procedural inadequacies are not fatal. Todd's mother had attended a previous IEP meeting (April 3, 1978) and was in fact aware of the purpose of such meetings. While the notice did not state who would be in attendance, the people who actually did attend were the same MDT members that had met with Mrs. B.

IEP Meeting" form. The school system would be well advised to compare this form with the applicable State and federal regulations concerning proper notice to insure that they are within conformity of the law.

on September 15. There were no surprise participants and no one that the parents expected to attend was absent. While a list of the names and positions of those expected to attend could easily and should have been supplied, the school's failure to do so did not in any way prejudice the parents. As to the failure of the notice to inform the parents that they could bring participants to the meeting, Mrs. B. was accompanied by a lawyer, and thus was in fact aware of her prerogative to bring an outsider.

Procedural safeguards, both under EAH-CA and elsewhere, are unquestionably of immense importance. In this instance, however, the minor procedural errors are not sufficiently important to justify invalidating the IEP. The B.'s were not actually prejudiced by the technical omissions in the October 8 notice, and the school did not act in bad faith or deliberately set out to provide inadequate notice.

### 2. Denial of Opportunity to Participate in Formulation of IEP

■ The parents contend, and the review officer determined, that at the IEP meeting of October 20, 1981, they were presented with a completed plan and were denied an opportunity to contribute to the plan's formulation. This allegation of procedural infirmity is a serious one, since, 1) if true the IEP may be invalidated without reference to its substantive merits or 2) the burden of proof on the issue of the adequacy of the IEP may be shifted.

The appropriate role for parents at an IEP meeting is addressed in a policy interpretation issued by the United States Department of Education, located in the *Education for the Handicapped Law Report*, Supplement 41, February 6, 1981, p. 103:52 which reads as follows:

26. WHAT IS THE ROLE OF THE PARENTS AT AN IEP MEETING?

The parents of a handicapped child are expected to be equal participants, along with school personnel, in developing, reviewing, and revising the child's IEP. This is an active role in which the parents (1) participate in the discussion about the child's need for special education and related services, and (2) join with the other participants in deciding what services the agency will provide to the child. (NOTE: In some instances parents might elect to bring another participant to the meeting, e.g., a friend or neighbor, someone outside of the agency who is familiar with applicable laws and with the child's needs, or a specialist who conducted an independent evaluation of the child.)

The clear and unambiguous language of this policy interpretation stresses the significance of parental input in the development of an IEP. The importance of procedural safeguards upon this parental input has been noted by the United States Supreme Court. The Court compared the procedural and substantive requirements in the wording of EAHCA and concluded that:

... the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., § 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard. We think that the Congressional emphasis upon full participation of concerned parties throughout the development of the IEP ... demonstrate[s] the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 102 S.Ct. at 3050

The importance of "involving parents in the development of an educational program for their children cannot be overstated." *Lang v. Braintree School Committee*, 545 F.Supp. 1221, 1223 (D.Mass.1982). The procedural requirements of the Act are not satisfied if the parents are included "only in the initial and penultimate steps of the

planning process." *Id.* at 1223. Parents must be invited to participate in all significant decisions made by the school with regard to their children. They have an enforceable legal right to "participate in the development of an IEP" for their child, *Burlington School Committee v. Department of Education of the Commonwealth of Massachusetts,* — U.S. —, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); 736 F.2d 773 (1st Ct.1984), and it is impermissible "for an agency to present a completed IEP to parents for their approval before there has been a full discussion with the parents of (1) the child's need for special education and related services and (2) what services the agency will provide the child." *Education for the Handicapped Law Report,* Supplement 4, February 6, 1981, p. 103:59.

The crucial question therefore, is whether the parents were given a meaningful, adequate opportunity to participate in the formulation and development of Todd's IEP. I find that the record indicates that the parents were indeed given the opportunity to, and in fact did, take an active role in the development of their son's IEP, and that Scituate has satisfied the procedural requirements of EAHCA.

Once Todd's mother requested an IEP for her son, in April of 1981, the school made numerous efforts to discuss Todd's learning problems with her. A family social history was compiled on July 30, 1981, and the parents were asked to describe Todd's learning problems and his emotional and physical development (Parent's Exhibit (P)–5). This social history, which was compiled to aid in the development of Todd's IEP, included the parents' "perceptions regarding educational placement" and offered the B's the first of several opportunities to provide input into the formulation of an educational plan. On September 15, 1981, Todd's mother met with the MDT to review evaluations that had been taken of Todd. At this meeting, Mrs. B. asked questions and offered her opinion about her son's future education. When the MDT informed her that they intended to recommend placement in a self-contained Scituate Classroom, she expressed her dis-

agreement with the proposal. She explained the reasons for her dissatisfaction with Scituate's plan for her son, and with the school's special education services in general, and asked the MDT to visit Linden Hill, the school at which Todd was currently enrolled. Her hope was that, after seeing Linden Hill, what it had to offer Todd and how he flourished there, the committee might change its recommendation about placement. That Mrs. B. made suggestions and recommendations at the September 15th meeting clearly indicates that she had, and was aware of, an opportunity to help formulate Todd's IEP.

The record indicates that Robert DeMagistris, Director of Special Education for the Northwest Special Education Region, was open and receptive to input from the parents while the IEP was being formulated. In addition to visiting Linden Hill, on October 5, 8, and 13, DeMagistris wrote letters to the Headmaster of the school inviting him and his staff to the IEP meeting, "for the purpose of sharing *input* into the *development* of appropriate goals and objectives for Todd's educational program." (emphasis added). One letter states that "[t]he purpose of the meeting will be to generate specific goals and objectives to address educational needs." The October 5 letter refers to the IEP conference as a "group activity" where "participation" and "input" are desired. DeMagistris' correspondence with the Headmaster of Linden Hill demonstrates that the school was actually receptive to input about the substance of the IEP at the October 20 meeting. The school's willingness to incorporate the parent's ideas is also evidenced by the fact that the IEP meeting was scheduled at a convenient time for Mrs. B. and that every effort was made throughout the process to keep her apprised of what the school specialists were doing and what her rights were.

The parents contend that the IEP of October 20 is invalid because it was presented to them as a completed plan scheduled to take effect immediately; they believe that the purpose of the meeting was to present

the plan to the parents for their rejection or approval—not to develop a plan. The basis of the parent's assertion is that the IEP, as presented to them, was clearly designated "Independent Education Program" and was to be effective from "October 20, 1981—October 20, 1982" (P–12). The mere fact that the school came to the meeting with a document that was titled Independent Education Program and was dated to take effect immediately does not invalidate the IEP meeting of October 20, or the product of that meeting.

An IEP should contain, whenever appropriate, "the projected date for initiation and anticipated duration of such services." 20 U.S.C.A. § 1401(19) (West 1978). That the school's proposal evidenced a desire to commence Todd's education as soon as parental permission was received does not in and of itself indicate that the school came to the October 20 meeting with an immutable, unchangeable, completed plan subject only to parental acceptance or rejection. Additionally, it is "appropriate for agency staff to come prepared with evaluation findings, statements of present levels of educational performance, and a recommendation regarding: annual goals, short term instructional objectives, and the kind of special education and related services to be provided. However, the agency must make it clear to the parents at the outset of the meeting that the services proposed by the agency are only recommendations for review discussion with the parents". (*Education for the Handicapped Law Report*, Supplement 4, February 6, 1981, p. 103:59)

That the parents were aware of their right to offer input at the IEP meeting seems clear. Mrs. B. attended the meeting with her attorney, and through the attorney inquired as to the number of students in the Title I reading class. Although Mrs. B. and her attorney did not actively participate at the IEP meeting, they were aware that they had the option to do so and that their input was welcomed. They were not in any way discouraged from participating. In a letter written three days after the IEP conference, Mrs. B's attorney informed the school that the parents needed additional time to evaluate the IEP. "They will then inform the school what, if anything, they feel must be added, eliminated, or changed before they're satisfied it correctly identifies and meets Todd's educational needs. They won't be in a position to accept or reject it until they hear back what changes the school is willing to make ..." The language of this letter demonstrates that the parents did in fact know that they had a right to disagree with the school specialists' opinions, to request changes in the proposed IEP and to generally provide input.

After evaluating the relevant information available to me, I have determined that the October 20, 1981 IEP was a valid product of the approved process. The requisite opportunity for parental involvement, crucial to acceptance and implementation of a valid IEP, did exist. The IEP which was prepared prior to the conference was a professional recommendation only; the purpose of the meeting was to discuss the proposals, receive input from any interested parties, and to formulate a final, formal independent education program for Todd.[2]

---

**2.** Even were this Court to find that the development of the IEP was procedurally inadequate, it is by no means clear that as the parents contend, this type of procedural error would be sufficient to invalidate the IEP without reaching the question of the program's adequacy. The immense importance of procedural safeguards under EAHCA has been noted repeatedly. *Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050–51; *Burlington*, 736 F.2d at 783. In fact, one court has held that "lack of notice to the parents, then, regarding their procedural rights drives a stake into the very heart of the Act." *Burlington, supra* at 783.

Despite the tremendous importance accorded procedural safeguards, and contrary to the defendant's contention, there is no authority which mandates that an IEP developed in a procedurally flawed manner is automatically invalid. With the exception of an intermediate state court decision, *Isgur v. School Committee of Newton*, 9 Mass.App. 290, 400 N.E.2d 1292 (1980) and a federal court case applying the substantive law developed in *Isgur, Burlington, supra*, at 786, this is an issue of first impression. While grave procedural errors that go to the heart of the rights protected by EAHCA may be sufficient to invalidate an IEP on its face, no

**1232**

## II. ADEQUACY OF THE PROPOSED IEP

### 1. Applicable Legal Standard [3]

The EAHCA is a funding vehicle through which the federal government channels money to the states to provide full educational opportunities to handicapped children. In order to be eligible for these funds, states must comply with numerous conditions including establishing a policy which assures all handicapped children of a right to a "free appropriate public education." [FAPE] As long as the state complies with the minimum federal requirements, it remains eligible for federal funds: each state is free to impose higher substantive standards and to provide handicapped children with greater rights, however. In order to determine whether an IEP is adequate and appropriate for a particular child, the district court must take into consideration "the federal minimum requirements and consistent state interstitial regulations." *Burlington*, 736 F.2d at 780. If the state substantive standards guarantee a higher level of educational quality and benefits for disabled children then the federal minimum, the state standard will be given effect. *Id.* at 789.

The federal act establishes a basic floor of education and may provide a lesser standard of educational services and procedural protection than state law mandates. EAHCA specifies that a federal "free appropriate public education" must meet the standards of the state educational agency. 20 U.S.C. § 1401(18)(B). Because EAHCA incorporates by reference state standards that exceed the federal minimum, a "district court's inquiry must include a determination whether the state substantive standard exceeds the protection and services required by the federal Act. If it does, the state standard will operate to determine what an appropriate education requires for a particular child in a given state." *Id.* at 789.

Todd B.'s parents argue that Rhode Island has adopted a higher standard for a FAPE than the federal one. Although the language of EAHCA provides no clear guidelines for evaluating the adequacy of proposed special education, numerous courts have interpreted the statute and given concrete meaning to the requirement of a FAPE. *Colin K. v. Schmidt*, 536 F.Supp. 1375, 1386 (D.R.I.1982); *affirmed*, 715 F.2d 1 (1st Cir.1983). In *Rowley, supra*, the United States Supreme Court held that EAHCA requires states to provide "services to permit the child to benefit educationally from" that instruction. The court in *Rowley* warned that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." 102 S.Ct. at 3051. *See also, Lang* at 1227. The First Circuit has used the standard "reasonably calculated to enable the children to receive educational benefits." *Colin K.* 715 F.2d at 4.

"Whatever the precise definition of FAPE, the term certainly does *not* mean the *best* education possible." *Colin K.* 536 F.Supp. at 1386; *Springdale School District No. 50 v. Grace*, 656 F.2d 300, 304

---

court has yet had to address the issue. While automatic invalidation of the IEP might be called for, other possible approaches to dealing with procedural deficiencies might include: seeing if the substantive rights of the child were adversely affected by the error, looking for bad faith on the part of the school, and switching the burden of proof with regard to the adequacy of the IEP.
Because I find that the IEP was formulated according to the mandated procedure, I do not reach the issue of the effect of procedural irregularities to a proposed IEP.

**3.** Another issue, often critical to the determination of the adequacy of the IEP is burden of proof. Although ordinarily the parents as the

ones challenging the proposed IEP have the burden of proving it inadequate, there is some authority which suggests that procedural errors committed by the school and the "preference in EAHCA for maintaining the status quo where the child is already receiving an appropriate education" may justify switching the burden of proof to the school to prove the program adequate. *Lang*, at 1228. Since I find the proposed IEP adequate regardless of who bears the burden of proof, I do not reach this issue. Additionally, I do not reach any conclusions as to whether Linden Hill was providing Todd with an "appropriate" education under the Rhode Island Special Education Regulations.

(8th Cir.1981), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983); *Bales v. Clarke,* 523 F.Supp. 1366, 1370–71 (E.D.Va.1981). The Federal Act contains no requirement to maximize the potential of each handicapped child. *Rowley* at 3047.

The parents contend that the IEP developed for Todd does not comply with either EAHCA or the Rhode Island statute or regulations. They argue that the Rhode Island statute that governs education of handicapped children (R.I.Gen.Laws § 16–24) imposes a higher standard on school committees than the federal standard. Their argument is based primarily on statutory construction.

Since the Rhode Island standard is nowhere explicitly set forth, since no state court has yet addressed the issue, and since I deem the appropriate standard to be critical to the resolution of this litigation, I am forced to determine what the Rhode Island standard is.[4] In the absence of a state court ruling, the duty of the district court "is to decide, not avoid, the question. In vicariously creating law for a state, the federal court may look to such sources as the Restatement of Law, treatises, and law review commentary, and the majority rule." Wright on Federal Courts § 59 (1976). The function of the court is not to choose the rule that it would adopt for itself if free to do so, but to choose the rule that it believes the state court is likely in the future to adopt. *Id.*

■ After studying the Rhode Island Handicapped Education Statute, state case law, and majority practices, for the reasons set forth immediately below, I have determined that Rhode Island does not impose a higher standard than the federal minimum for satisfaction of the FAPE requirement. Although R.I.G.L. § 16–24–1 says that the school committee "shall provide such type of special education that will best satisfy the needs of the handicapped child," I do not read this provision to be a substantive standard intended to displace the federal one. The statute was originally adopted decades prior to the adoption of EAHCA. Since EAHCA federal funding legislation was passed, all the regulations promulgated under the statute have echoed the terminology of the EAHCA almost verbatim.[5] The Rhode Island regulations, like the statute under which they are promulgated, nowhere set out what level of services must be provided to the handicapped child except to echo EAHCA standards.

No Rhode Island courts have defined the scope of FAPE in the state, and only one state decision deals expressly with R.I.G.L. § 16–24–1 and its relationship to the federal scheme. *Smith v. Cumberland Sch. Committee,* 415 A.2d 168, 171–72 (R.I.

---

**4.** Counsel for the school suggests that in *Colin K. v. Schmidt,* 536 F.Supp. 1375 (D.R.I.1982), 715 F.2d 1 (1st Cir.1983) this court determined that the standard in Rhode Island is the same as the federal standard. *Colin K.* did not reach the issue of whether the Rhode Island statute and regulations impose a higher standard, however. In that case the evidence was sufficient to establish that the proposed IEPs were inadequate under the federal FAPE standard.

**5.** The federal definition found at 20 U.S.C. Section 1401(18) reads as follows:

The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate pre-school, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

The Rhode Island Regulations at Section One–11–2.0 contain the following definition:

Free appropriate public education—as used in these regulations is defined as special education and related services which:

(a) Are provided at public expense, under public supervision and direction, and without charge.

(b) Meet the standards of the State Educational Agency and Federal laws and regulations.

(c) Include preschool, elementary school, or secondary school education.

(d) Are provided in conformity with an individualized program which meets the requirements under 4.0 of these regulations.

The standards of the State Educational Agency referred to in both definitions are those state statutes and regulations that contain specific directives not contained in or inconsistent with the federal regulations.

1980). While the court in *Smith* held that "pursuant to § 16–24–1 a school committee has an affirmative obligation to provide the type of special education that will best satisfy the needs" of a handicapped child, the court goes on to say that "§ 16–24–1 must be viewed in the context of the EAHCA." *Id.* at 172. The State Supreme Court justice said, "[i]t is evident from the regulations adopted by the board of regents pursuant to § 16–24–2 that the regents have attempted to conform to the Act by making our existing educational system for handicapped children provide special educational services in the manner envisioned by the Act." *Id.* While I conceed that § 16–24–1 can legitimately be read as imposing a higher standard on Rhode Island school committees, I find the more logical and plausible interpretation is that Rhode Island adopts the federal standard. The striking parallels between the Rhode Island Regulations and the federal scheme seem to support this construction. Additionally, while most states appear to have adopted the federal standard, those states which have adopted a higher standard of FAPE have done so through legislation which clearly indicates such intent.[6] As the Rhode Island statute does not clearly create a standard separate from and higher than the federal one and as there is no authority in state case law, even in dictum, suggesting a higher standard, I cannot conclude that the state legislature intended, or that the Rhode Island courts would imply, a state right to FAPE qualitatively greater than the federal right.

2. Adequacy of the IEP

■ After an exhaustive review of the exhibits, depositions, testimony, briefs, and previous decisions rendered in connection with this case, giving due deference to the hearing officer's impressions of the witnesses, see *Burlington* 736 F.2d at 791–92, I find that Scituate did offer Todd an educational program designed to benefit him. Under the proposed IEP, Todd was to be placed in a self-contained classroom with other learning disabled children, one teacher, and two aides. The evidence shows that Ms. MacDonald, teacher of the class proposed for Todd, has a teaching certificate from the Board of Regents for Education of the State of Rhode Island for both middle and secondary grades of mild/moderate handicapped students and for moderate/severe/profoundly handicapped students. (S–27) One of the aides has served as a special education teacher's aide in the Scituate school system since 1979 and was once a certified teacher. (S–33) The other aide obtained an Associate Degree in Special Education in 1982 and has been a special education teacher's aide in Scituate since 1978. (S–32) While Ms. MacDonald, at the time the IEP was prepared, had limited experience in teaching a self-contained classroom, she was certainly adequately qualified to help provide handicapped students like Todd with an education designed to impart "educational benefits." She student-taught a self-contained class from November 1980 until January 1981 and received an honor award for that teaching; she also served a special education internship from January 1981 until May 1981. Though the B's point to the fact that Scituate's self-contained classroom had been instituted only one year earlier as an indication of the inadequacy of the program, the age of the self-contained classroom bears no relationship to the effectiveness of the program.

Another argument that the parties advance is that Todd was not placed in a homogeneous grouping as there were less disabled children in the class and children with dissimilar handicapping conditions. Section Three–II–2.1.3 of the Regulations requires a homogeneous grouping. The makeup of the proposed class appears to be sufficiently homogeneous, however. All the students were classified learning dis-

---

**6.** In Massachusetts, for example, Mass.Gen.Law 71B § 3 mandates: "If the evaluation of the special education program shows that said program does not benefit the child to the maximum extent feasible, then such child shall be reassigned." There is also voluminous case law in Massachusetts indicating that the state standard is higher than the federal one. See *Burlington.*

abled,[7] were of at least average intelligence, had learning disabilities in areas involving reading or language, and ranged in age from 13 to 16 years. (Todd was 14 years old at the time). The reading level of the class, an area of critical importance for Todd, ranged from fourth to fifth grade. Tests indicate that Todd's reading ability fell within this range. (P–13, 15, 31) Thus, there is nothing inherent in the self-contained classroom's makeup that renders it inadequate for Todd. It is reasonable to conclude that the group was sufficiently homogeneous and to infer that Todd would have received educational benefits in the proposed situation.

One of the parents' primary grounds for contesting the adequacy of the IEP centers around the fact that the proposed plan provided Todd with reading only two times a week. The parents contend that Scituate's proposal to give Todd only two reading periods indicates both that: 1) the school officials did not have a sufficient understanding of Todd's disability to develop an adequate plan, and 2) the proposed plan was fatally inadequate since experts agree that children with Todd's type of disability need constant reading reinforcement. To further buttress their position, the parents point to the fact that after they rejected the IEP, but prior to the due process hearing of September 1982, Scituate amended the proposed IEP to include reading five times a week.

I cannot agree with the B.'s contention that Scituate's failure to recommend more frequent reading instruction for Todd indicates that they did not have an acceptable minimum level of understanding about his handicap, or that they adopted a "cavalier" attitude toward Todd's education. According-ing to the testimony of Mr. DeMagistris, Scituate Special Education Director, the MDT was fully aware of Todd's reading difficulties and these difficulties were kept in mind while the IEP was being formulated. The team felt two periods of formal reading would suffice since Todd would be getting reading reinforcement five days a week in all other subject areas in the self-contained classroom. (Transcript (T)–191). Mr. DeMagistris also testified that Todd's reading periods could be increased if necessary to meet Todd's changing needs. The hearing officer found that "it also seems logical that since the MDT intended to change the methodology of Todd's reading ... it would be advisable to:

1. Proceed slowly with formal reading
2. Hopefully introduce Todd to the joy of reading
3. Alleviate some of his emotional problems as they relate to his reading problem"

(Decision (D)–38)

The hearing officer also found that the MDT's cautious approach to formal reading on October 20 was justified when one considered the effects Todd's reading problem has on his self esteem. The evidence offered by Mr. DeMagistris, the findings and perceptions of the hearing officer, and Scituate's written evaluations of Todd, demonstrate that the school was indeed aware of Todd's disability and its relationship to reading. As the testimony from both parties indicates, there is a tremendous amount to disagreement and uncertainty over the best method of treatment for dyslexics.[8] Viewing the identical test results and teacher evaluations of a particular child, reputable experts in the area may differ dramatically in the type of education-

---

7. Much attention is devoted in the record to a debate over the proper term to use to categorize Todd's degree of disability. Various opinions are proferred—from mild to moderate to severe. No decision need be reached on which subjective name to give Todd's disability; the crucial issue is that he receive an effective, appropriate education, regardless of how he is labeled.

8. The parents, who believe Todd to be dyslexic, are disturbed that Scituate refuses to call Todd dyslexic and refers to him as learning disabled instead. Once again, I find that the subjective appellation given to the disorder is not nearly as important as the diagnosis and the treatment. Since there is such a wide disparity of views on what constitutes dyslexia and how it is best treated, Todd's education should not be affected regardless of whether he is labeled dyslexic or learning disabled. Dyslexia is certainly a learning disability.

al approach they recommend. Failure to recommend five reading periods a week is indicative of a difference of opinion on how to treat Todd, not of a fundamental misunderstanding of Todd's problems by the school committee.

As to the parents' second contention about the proposed IEP—that reading only two times a week is inadequate—this court need not address which type of treatment (Orton-Gillingham, language-experience approach, etc.) would best enable Todd to learn; the proper inquiry is whether Scituate's proposal satisfied the federal definition of FAPE. The parents feel that two reading periods a week was an inadequate program for their son. While I agree that the evidence indicates that Todd could have benefited from more frequent reading, for numerous reasons I do not feel that Scituate's program was inadequate on this basis. The hearing officer found that Scituate had some legitimate reasons for suggesting only two reading periods per week. He also found Scituate's witnesses to be credible and these witnesses testified that had Todd evidenced a need for more frequent reading, such instruction would have been provided.[9] (T-128, 247) Additionally, the record indicates that had the parents participated more fully in the IEP meeting of October 20, and expressed concern over the number of reading periods proposed, Scituate would have been willing and able to provide additional reading for Todd. (T-241-45) While the parents should not bear the burden of insuring that the school develop an adequate IEP, in this instance they cannot be heard to complain that the proposal was inadequate in a particular aspect after remaining mute as the plan was being developed and when their comments were explicitly requested. It appears that Scituate was willing and able to provide Todd with an adequate FAPE. That the proposed IEP was amended dur-

ing the course of litigation to include reading five times a week is not indicative of defects with the first IEP. Not until the litigation began did the school receive any indication of why the parents were dissatisfied with the proposed IEP. Scituate's willingness to change the plan, whether motivated by a bona fide concern for Todd's welfare and his parents' happiness or by the imminent litigation, is not prima facie evidence that the original IEP was inadequate. While the parents have a right to be provided with a complete IEP, not an ever developing one, it is in the handicapped child's best interests, indeed it is crucial, that the plan remain flexible enough to accomodate problems that arise for the child during the period in which an IEP is in effect.

Evidence that the program offered by Scituate would have provided Todd with educational benefits is found throughout the record. The class size and mode of instruction is comparable to that of Linden Hill and is adequate to meet Todd's needs. (P-12, P-14, and D-40-42), The methodology of Scituate's proposed program is also sound. Scituate uses an individualized approach for each student once a diagnosis is made as to the child's disability. (T-131, 132, 307, 308, D-43). The program is premised on the belief that symptoms of children with the same type of handicap may vary. Linden Hill utilizes the Orton-Gillingham Method (T-109, 110), maintaining that the term dyslexic refers to definite symptoms and therefore requires a definite type of teaching methodology. The scholarly literature currently available on dyslexia indicates that there are many definitions of the disorder and no single consensus as to the best method of treatment. (D-43-44). The parents offered expert testimony to show that the Orton-Gillingham approach used at Linden Hill is consistently helpful and appropriate for use with dys-

---

**9.** The parents allege, and the school does not disagree, that when the IEP was first proposed, there were no Title I reading positions open. The school maintains that they would have created a spot for Todd if he had in fact needed one or if more reading was included in the IEP after the parents' opportunity for input. While I cannot divine whether Todd could have been so accomodated, I believe that the IEP as developed, with two reading periods was adequate for Todd's needs.

lexic students. There is little evidence to indicate, however, that the approach recommended by Scituate would not also be beneficial for Todd. Dr. Cole, the parents' medical expert, and Ms. Capabianco, Scituate's reading consultant, disagree as to which type of approach would be most successful with Todd. There is no consensus of opinion among the experts or the parties to this case as to the symptoms, causes, and treatment of dyslexia. Although Ms. Capabianco believes Todd would be better served by Scituate's approach than by the use of Orton-Gillingham, with which she is familiar (D–45, T–303), the school need not prove this contention. If Scituate can show that Todd would benefit from the approach offered in the IEP, such a showing will suffice.

It seems evident that the Scituate IEP would have provided Todd with an adequate FAPE. The teachers that would have been working with him have impressive qualifications. (S–27, 30, 28). They are state certified to teach learning disabled children (none of the teachers at Linden Hill are certified) and have special expertise with reading disorders such as Todd's. At least one of the teachers available to Todd was familiar with the Orton-Gillingham technique, and while she did not think it a good method for Todd, she could have used it if it proved beneficial. Even the parents' medical expert agrees that the goals of the proposed IEP are worthwhile—his primary quarrel is with the lack of indication as to how these goals are to be implemented. (Cole deposition 22). I find that not only were the objectives adequate, but the ways in which the school proposed to help Todd satisfy them were also adequate.

The parents rest their case on the inadequacy of the proposed IEP primarily on the testimony of Dr. Edwin M. Cole, a renowned language disability expert. Dr. Cole testified that in his opinion Scituate was not able to handle "this type of case." (Cole deposition—31). Dr. Cole based his opinion as to the adequacy of the proposed IEP on a discussion with the parents, a forty minute meeting with Todd, and Ms. White's test results. Ms. White is a psychologist at the Cortical Function Test Lab, of which Dr. Cole is director. The White test results were discredited by the B.'s own witness, Christopher Harris, who testified that the Linden Hill tests, administered less than two months after the White tests, were more accurate. Todd scored significantly better on the Linden Hill tests. Ms. Capobianco, the Scituate reading specialist, also testified as to the numerous shortcomings of the White test results. (T 310–321). When asked specific questions about Todd's appearance (such as whether he wore glasses), Dr. Cole was unable to remember, illustrating how short a time he spent with Todd.

Because Dr. Cole based his conclusions on depressed test results and limited conversation with Todd and his parents, his evaluation of the proposed IEP is not exceedingly persuasive. In his deposition he testified that Todd "isn't going to be able to do a great deal of textbook reading—possibly he will have texts read to him" (Cole deposition—19). This is a description of a child far less advanced than Todd. A teacher at Linden Hill said about Todd: "he is capable of reading and understanding a high school text book" (P–40). Dr. Cole was basing his evaluation of the IEP as a program for a child with a reading comprehension level of grade 3.5, far below Todd's ability. His endorsement of Linden Hill as the best placement for Todd was predicated on his belief that the Orton-Gillingham approach was best for Todd and that the staff of the school was certified in the technique. In fact, the Orton-Gillingham technique might have been inappropriate for a child with the deficiencies exhibited by Todd (T–295–95), because the method prescribed work in areas of Todd's strengths and ignored the areas of his weaknesses. Additionally, Dr. Cole's assumption about the credentials of the Linden Hill staff was erroneous; none of Todd's teachers at Linden Hill were certified in the technique, although some were "Orton-Gillingham trained."

One of the primary reasons that Dr. Cole's testimony is unpersuasive is that he was almost completely ignorant of the specifics of the Scituate program. He was unaware that a self-contained classroom was being proposed and he testified that he was unaware if individual or group work was called for. (Cole deposition 22). Because Dr. Cole was basically ignorant of the Scituate program, his opinion of its adequateness is not very probative. His endorsement of the Orton-Gillingham technique is irrelevant since it goes to the best technique for Todd, not the adequacy of the proposed plan. Even if Dr. Cole were to believe that the Orton-Gillingham method were the only adequate means of educating Todd, his lack of familiarity with the boy weakens his testimony.

There is a strong state and federal policy favoring placement in day programs over residential ones, and mainstreaming over segregation of handicapped children. Section One–V–5.0 of the Rhode Island Special Education Regulations requires that a child be placed in the least restrictive placement on the continuum set forth in Section Two–1.0. The self-contained classroom is ranked fourth in the seven level continuum while residential placement is ranked seventh—most restrictive. The regulations also require that children be educated to the maximum extent appropriate with non-handicapped children and that they be placed as close to home as possible. Section One–V–5.0. The intent of the regulation was to insure that handicapped children were not secreted away with other disabled children and hence deprived of beneficial social interaction with their non-handicapped peers. While Scituate's program is preferable to Linden Hill's in this regard, there are certainly situations in which residential placement is called for. There is no evidence which indicates that this is such a case, however. Testimony was offered as to Todd's participation in athletics and study hall at Linden Hill, and to his early bedtime. All of these benefits, while they certainly contributed to Todd's progress, could easily have been realized in Scituate as well. Todd would have been free to participate in athletics at Scituate. (Indeed, he would have had an opportunity to interact with non-handicapped children at athletic and cultural activities, an opportunity which Linden Hill could not provide him.) His parents would have been able to impose a study period at home and to create and enforce an early curfew. There is no indication that anything about Todd's disability or its symptoms mandates a residential placement. Selection of the least restrictive alternative in Todd's case would have created no harmful effects and would deprived him of no services.

There is no doubt that the Linden Hill approach was beneficial to Todd. The evidence indicates that he blossomed there, notwithstanding the fact that he was away from home, isolated from his family and non-handicapped children, and being taught by uncertified teachers. The care and instruction he received at Linden Hill was effective and invaluable to him. Regrettably, however, the law does not allow me to choose the educational plan I feel would be best for the child; the sole focus of my inquiry is whether the plan proposed by the school is an adequate FAPE under the statute. Based on the foregoing consideration of the testimony, exhibits and hearing and review officer decisions, I find that the Individual Educational program dated October 20, 1981, prepared by the Northwest Special Education Region for Todd B. was adequate to meet his needs and to provide the "free appropriate public education" which is guaranteed by EAHCA and the Rhode Island Statute and Regulations.

### III. *Parent's Right to Reimbursement*

Because I find the Scituate IEP appropriate, the parents' rejection of the plan and their continued unilateral placement of Todd at Linden Hill relieves the Scituate School System of all responsibility for reimbursement to the parents for costs incurred to educate their son at Linden Hill. This opinion addresses only the proposed IEP and does not reach the issue of whether Scituate would now be able to provide Todd

 

with an adequate education, were the parents to so request.

An order will be prepared accordingly.