702 F.Supp. 1158 (1988)
B.G., by his Guardian Ad Litem, F.G., Plaintiff,
v.
CRANFORD BOARD OF EDUCATION, Defendant.
CRANFORD BOARD OF EDUCATION, Plaintiff,
v.
B.G., by his Guardian Ad Litem, F.G., Defendant.
Civ. A. Nos. 87-1360, 87-4745.
United States District Court, D. New Jersey.
December 29, 1988.
*1159 Weinberg & Kaplow, P.A. by Richard J. Kaplow, Springfield, N.J., for plaintiff.
Theodore A. Sussan, Spotswood, N.J., for defendant.

SUPPLEMENTAL OPINION
WOLIN, District Judge.
This opinion supplements a prior opinion issued by the Court and filed on November 18, 1988. That opinion affirmed the decision of the Administrative Law Judge ("ALJ") providing for B.G.'s residential placement and directed that the Cranford Board of Education ("Board") pay for all of its associated costs. Left unresolved and reserved was the issue of reimbursement to B.G.'s father ("F.G.") for a voluntary and unilateral placement of B.G. at the Youth Behavior Program ("YBP") in Colorado. For the reasons contained in this opinion, reimbursement to F.G. for B.G.'s placement at YBP is denied.

I. PROCEDURAL AND FACTUAL HISTORY
The Court's initial opinion, 702 F.Supp. 1140 (D.N.J.1988), is incorporated herein by reference, thereby eliminating the need for an exhaustive reiteration of the prior case history. Only facts that relate to disposition *1160 of the pending issues are set forth in further detail.

A. The ALJ's Opinion

The ALJ concluded that F.G. was not entitled to reimbursement for placing B.G. in the YBP program since B.G. was not receiving special education in a self-contained classroom for emotionally disturbed students. Accordingly, YBP was not an appropriate placement and the reimbursement provided by Town of Burlington v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), was inapplicable to the established facts of this case. Although the Court affirms this determination, other considerations of statutory, administrative and decisional law require a more expansive discussion of the reimbursement denial.

B. Factual Considerations

After the Child Study Team ("CST") initially classified B.G. as perceptually impaired ("P.I."), F.G. was aghast and after listening to their presentation, left the conference in "absolute, total, sheer disgust." He characterized the conference as an "absolute, positive charade" and attributed the CST recommendation to "nothing more than a school board fearful that they were going to have to pay for a kid to go to a special treatment center and they didn't want to fund it." F.G. and his wife ("the F.G.'s") refused to sign the Individualized Education Program ("IEP"). On June 6, 1986, F.G. advised the CST by letter that he refused to consent to the IEP and considered any further contact or effort to request a different placement a "waste of time."
At or about this time, F.G. had learned of YBP and determined that it was the proper placement for B.G. He was encouraged in making this decision by Dr. Leonard Volenski, a certified school psychologist and a licensed clinical psychologist, who had been treating B.G. on a weekly basis since December 1985. Though Volenski felt that the least restrictive setting for B.G. would be a residential placement, he was able to recommend YBP since it was the only program of which he was aware that addressed attachment disorders of Korean children. (B.G. is an adopted Korean child.) At the time of this recommendation, Volenski was under the impression that B.G. would attend public schools as a classified student and be placed in a self-contained classroom for emotionally disturbed ("E.D.") students.
The Youth Behavior Program focus is on emotionally disturbed children with special emphasis on the unbonded attachment syndrome. Its primary goal is to gradually reintegrate an enrollee into the home environment within 12 to 18 months. Through a therapeutic approach of residing with surrogate parents, a program of individualized therapy, and an E.D. classification supplemented by a contained classroom, both the home and school problems are addressed. Unfortunately, as later learned, B.G. was not classified as E.D. (or in any other classification) nor was he placed in a contained classroom for E.D. students. He was "mainstreamed" without special education benefits and matriculated to the next highest grade at the completion of the academic year. At no time was YBP on the approved list of out-of-district educational placements maintained by the New Jersey Department of Education. In fact, the Department of Education does not consider YBP an educational program. At footnote 13 of its original opinion, this Court concurred in the Department's opinion and stated:
YBP is not an educational program and does not contain an educational component. YBP confronts negative behavior in emotionally disturbed children by application of appropriate reasonable consequences to negative behavior, thereby making the child totally accountable. Under its program the child lives with a therapeutic foster family and receives individual therapy; a therapist is on call 24 hours per day.
702 F.Supp. at 1146 n. 13.
While B.G. was enrolled at YBP, residing with surrogate parents, and attending Jefferson County schools, procedural aspects of the case were unfolding. The Board *1161 requested a due process hearing, which resulted in a reversal of the P.I. classification. The ALJ determined that an E.D. classification was the appropriate classification for B.G. The CST then implemented another in-district program, which they presented to the F.G.'s at a planning conference on February 12, 1987. The conference was very brief, lasting some 10 to 12 minutes, and concluded without any discussion. The F.G.'s were presented with a copy of the proposed IEP. Parenthetically, the CST was unwilling to recommend YBP as an out-of-district placement because it thought that YBP was inappropriate for B.G.'s educational needs. There was no further contact between the F.G.'s and the CST related to B.G.'s proposed IEP. Instead, on February 25, 1987 the F.G.'s requested a due process hearing, as the Board had previously requested when the first IEP was rejected. On September 30, 1987 the ALJ decided that a residential placement was the least restrictive environment for B.G. She also denied F.G.'s claim for reimbursement; that denial, inter alia, invited this litigation.

II. STATUTORY PROVISIONS AND ADMINISTRATIVE REGULATIONS
The essence of F.G.'s claim for reimbursement pertains to the breadth and scope of the term "related services" as it appears in the Education of All Handicapped Children Act ("EAHCA"), 20 U.S.C. ง 1401 et seq., and New Jersey Administrative Code ("N.J.A.C.") 6:28-1.1 et seq. F.G. does not assert that he is entitled to reimbursement on the ground that YBP was a residential placement; he concedes that it is not. Rather, he bottoms his reimbursement theory solely on the "related services" aspect of the law. He argues that psychological services fall within the purview of "related services" necessary to a free appropriate public education regardless of their geographical location โ whether it be Cranford, New Jersey, or Evergreen, Colorado.

A. EAHCA

Through the legislative vehicle of the EAHCA, Congress in no uncertain terms provided to handicapped children meaningful access to a "free appropriate public education." 20 U.S.C. ง 1412(1) & (2). Included in the definition of a free appropriate public education is the right to special education and "related services." Id. ง 1401(16)-(18). Special education and related services are specifically defined in ง 1401(16) and (17) of the Act, respectively. Psychological services are expressly provided for in the definition of "related services." A fair reading of each of these sections demonstrates the criticality of employing modalities that meet the unique needs of the handicapped child and that will assist such child in benefiting from special education. Explicit in the phrase "free appropriate public education" is its availability at no cost to parents.
Probably the most essential element of the EAHCA's comprehensive educational plan is the development of an IEP as more particularly defined in 20 U.S.C. ง 1401(19). In its salient features that statute provides for a written statement for each handicapped child to be developed among the CST, the teacher, the parents and, whenever appropriate, the handicapped child. It also includes various data that permit an objective measurement of the relative success or failure of the plan.[1] Since the statutory scheme anticipates parental participation, *1162 a full panoply of procedural safeguards has been incorporated into the Act. Particularly relevant to this Court's inquiry are งง 1415(b)(1)(C) & (E), 1415(e)(2) & (3). Subsections (C) and (E) of ง 1415(b)(1) deal with notice to parents whenever a change is initiated. The subsections provide parents with an opportunity to participate in any matter that impacts on their child's right to a free appropriate public education. Subsections (2) and (3) of ง 1415(e) are operative sections to be applied when adversary proceedings ensue between the parents and the school authorities.[2] The last sentence of ง 1415(e)(2) cloaks the Court with the power to "grant such relief as the Court determines is appropriate."

B. N.J.A.C.

The New Jersey State Board of Education has adopted a broad range of rules pertaining to educationally handicapped pupils. Many of these rules either equal or exceed the provisions of the EAHCA. Through the N.J.A.C. general requirements, all educationally handicapped pupils are ensured a free appropriate public education that includes special education and/or related services. N.J.A.C. 6:28-1.1(b)(1). Subsection (d)(4) limits "related services" to those "located in State approved facilities that are accessible to the handicapped." Under the definitional section of the rules โ unlike the comparable EAHCA provision โ the term "related services" omits reference to "psychological services." N.J.A.C. 6:28-1.3.[3] Subchapter 2 of the rules, entitled "Procedural Safeguards," provides for parental notice, consent and participation, including appellate rights, should the board and the parents disagree. Id. 6:28-2.3(b)(2) & (3). Unlike the EAHCA, N.J.A.C. 6:28-2.6 provides for resolution of conflicts between parents and a school prior to a request for a due process hearing. The N.J.A.C.'s prescription for an Individualized Education Program, especially with its intent for parental participation in the program's development, id. 6:28-3.6(c), is equally as specific as the EAHCA. Subsection (e)(1) of N.J.A.C. 6:28-3.6 requires "[a] statement of the pupil's eligibility for special education and/or related services." N.J.A.C. 6:28-3.7, which sets forth a collection of "related services," provides for "in school" counseling, id. (a)(1)(i), and "[o]ther related services, as necessary, [to] be specified in the pupil's individualized education program." Id. 6:28-3.7(a)(1)(i) & (a)(6). Under subchapter 4, entitled "Programs," N.J.A.C. 6:28-4.1(a) requires that the district board of education provide educational programs and related services for handicapped pupils in accordance with their individualized education programs.

III. DISCUSSION
Whether F.G. is entitled to be reimbursed for his expenses arising from B.G.'s *1163 placement at the Youth Behavior Program depends upon whether YBP is a related service within the meaning of the EAHCA. Clearly, the concept of "related services" embraces and has been interpreted to include psychological services. T.G. v. Board of Education, 576 F.Supp. 420, 423 (D.N.J.1983), aff'd without opinion under various names, 738 F.2d 420, 738 F.2d 421 & 738 F.2d 425 (3d Cir.), cert. denied, 469 U.S. 1086, 105 S.Ct. 592, 83 L.Ed.2d 701 (1984); Papacoda v. Connecticut, 528 F.Supp. 68, 72 (D.Conn.1981). However, not every supply of psychological service may be considered a related service. The pivotal inquiry is whether the service was tailored to meet the unique needs of the handicapped child and whether it provided the child with some educational benefit. Board of Education v. Rowley, 458 U.S. 176, 188-89, 102 S.Ct. 3034, 3042, 73 L.Ed. 2d 690 (1982). Cognate to that inquiry is the requirement that the related service be incorporated into the child's IEP. Id. at 181-82, 102 S.Ct. at 3038. Unfortunately, not all IEP's are developed by agreement between the school authorities and the parents. When a dispute arises and the parents voluntarily and unilaterally remove the child from his or her educational placement to another placement during the pendency of the proceedings, the expense entailed is reimbursable provided the parental placement is determined to be proper under the EAHCA. 20 U.S.C. ง 1415(e)(2); Burlington, 471 U.S. at 368, 105 S.Ct. at 2002; Muth v. Central Bucks School District, 839 F.2d 113, 127 (3d Cir.) (reimbursement for learning-disabled child with associated emotional problems), cert. denied, ___ U.S. ___, 109 S.Ct. 103, 102 L.Ed.2d 78 (1988); Board of Education v. Diamond, 808 F.2d 987, 993 (3d Cir.1986) (reimbursement to parents for residential placement of a child with severe congenital physical abnormalities). Moreover, unilateral placement of the child elsewhere does not constitute a waiver of the parents' right to reimbursement nor does it violate 20 U.S.C. ง 1415(e)(3) (commonly referred to as the "stay put" provision).[4]Burlington, 471 U.S. at 372, 105 S.Ct. at 3004; Alamo Heights Independent School District v. State Board of Education, 790 F.2d 1153, 1160 (5th Cir.1986); cf. Wexler v. Westfield Board of Education, 784 F.2d 176, 182 (3d Cir.) (parents' withdrawal of child prior to enactment of ง 1415(e)(3) relieved town of liability for reimbursement), cert. denied, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986).
The parties have not cited, nor can this Court find, any legal authority addressing a factual pattern similar to B.G.'s where the claim for relief is directed toward the "related services" provision of the EAHCA.[5] However, the last sentence of 20 U.S.C. ง 1415(e)(2) provides guidance by use of the phrase "such relief as the court determines is appropriate." This provision was interpreted in Burlington, 471 U.S. at 374, 105 S.Ct. at 2005, to mean that equitable considerations are relevant in fashioning relief. Muth, 839 F.2d at 126. Therefore, whether reimbursement is appropriate and at what amount should be determined by "balancing the equities" of the particular case. Jenkins v. Florida, 815 F.2d 629 (11th Cir.1987). The Alamo court suggested factors to be considered in deciding the reimbursement issue. The factors are (1) the existence of other, perhaps more suitable substitute placements; (2) the parents' effort in securing alternative placements; and (3) the general cooperative or uncooperative position of the school district itself. 790 F.2d at 1161. Similarly, the Wexler court, exercising its broad discretion in denying reimbursement, was strongly influenced by the parents' *1164 failure to investigate the town's proposed program, as well as their placement of the child in another school without prior notice to or discussion with the school board. See 784 F.2d at 179, 183. With these thoughts in mind, a consideration of F.G.'s claim for reimbursement is appropriate.

A. Whether the Youth Behavioral Program Was Part of an Individualized Education Program Tailored to Meet the Unique Needs of B.G.

B.G. is a handicapped child who is classified as E.D. Each psychotherapist who examined him prior to his placement at YBP recommended a residential placement. Despite that knowledge, F.G. voluntarily and unilaterally placed B.G. with YBP. As previously stated, YBP is not an educational program and does not contain an educational component. It relies on the Jefferson County public school system for the education of its enrollees. B.G. was an unclassified student who was main-streamed (that is, placed with non-handicapped children). No IEP exists demonstrating that YBP's program was tailored to meet B.G.'s unique needs or that he would receive an educational benefit from it. In fact, after two years at YBP, B.G. made no visible educational headway.
The program afforded by YBP is undoubtedly a psychotherapeutic program but it is not a "related service" as contemplated by the relevant sections of the EAHCA. By definition, a "related service" is one that is required to assist a handicapped child in benefiting from special education. 20 U.S.C. ง 1401(17). Psychological services isolated from and incongruent with the educational experience necessarily fall outside the ambit of "related services." New Jersey, as pointed out in Geis v. Board of Education, 774 F.2d 575, 582 (3d Cir.1985), requires that its children be afforded a program that assures them the fullest opportunity to develop their intellectual capacities. The YBP program fails to measure up to that standard because it is not an educational program.
The ALJ first found that the YBP placement may be a related service under the education laws. Notwithstanding this gratuitous statement, she subsequently found YBP to be an inappropriate placement because of the absence of a self-contained class for emotionally disturbed students. Measured by the Alamo factors, the Court finds that there exist more suitable placements for B.G.;[6] that the F.G.'s employed minimal efforts in securing alternative placements; and that the CST, though misguided, was generally cooperative. At all times the CST stood ready, willing and able to discuss a negotiated program with the F.G.'s. Nonetheless, the F.G.'s voluntarily and unilaterally removed B.G. from his school district and placed him with YBP without prior notice or discussion with the CST.
Burlington and its progeny invest the Court with great discretion and call upon it to fashion relief with equitable considerations in mind. In balancing the equities between the Board and F.G., the Court finds that the scales of justice convincingly preponderate in favor of the Board. Having determined that B.G.'s placement at YBP was inappropriate and that its psychological component does not qualify as "related services," the Court is constrained to deny F.G.'s claim for reimbursement. As stated in Burlington, 471 U.S. at 373-74, 105 S.Ct. at 2004, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."

B. Whether Equitable Considerations Require a Denial of Reimbursement

A common thread of concern for parents' procedural safeguards is woven throughout the fabric of the statutory, administrative and decisional law. The EAHCA, in 20 U.S.C. ง 1415, requires state, local and intermediate educational agencies to establish and maintain procedures to assure that handicapped children and their parents will play an integral part in the formulation and development of an IEP that satisfies the *1165 free appropriate public education imperative. Included among parental rights are the opportunity to examine all relevant records pertaining to their child; written notice when the school agency proposes or refuses to initiate a change; an opportunity to present complaints; a right to a due process hearing; and, if necessary, the right to bring a civil action in any state court of competent jurisdiction or in a district court of the United States. The rules of the New Jersey Department of Education provide parallel protection to parents of handicapped children. Moreover, they attempt to resolve conflicts between parents and a school district prior to a request for a due process hearing. N.J.A.C. 6:28-2.6(a)(1). Such conflict resolution may occur through an administrative review by the local district or through mediation by the Department of Education. Id. 6:28-2.6(b) & (c).
In recounting the manner in which an IEP should be developed, the Supreme Court in Burlington employed words and phrases such as "jointly" and "cooperative approach." 471 U.S. at 368, 105 S.Ct. at 2002. It cautioned that the fashioning of relief, including retroactive reimbursement to parents, is subject to equitable considerations. Id. at 374, 105 S.Ct. at 2005. Other courts have noted the immense importance of involving parents in the development of their child's educational program. E.g., Scituate School Committee v. Robert B., 620 F.Supp. 1224, 1229 (D.R.I.1985), aff'd, 795 F.2d 77 (1st Cir.1986). The Robert B. court noted that "[t]he procedural requirements of the Act are not satisfied if the parents are included `only in the initial and penultimate steps of the planning process.'" Id. at 1229-30 (quoting Lang v. Braintree School Committee, 545 F.Supp. 1221, 1223 (D.Mass.1982)). The need for parental participation cannot be overstated. It is a prudent course and an enforceable legal right for them to participate in the development of an IEP for their child. The Robert B. opinion is particularly helpful in focusing on the interplay between parents and school authorities. The court in that case stated:
The mere fact that the school came to the meeting with a document that was titled Independent Education Program and was dated to take effect immediately does not invalidate the IEP meeting of October 20, or the product of that meeting.
An IEP should contain, whenever appropriate, "the projected date for initiation and anticipated duration of such services." 20 U.S.C.A. ง 1401(19) (West 1978). That the school's proposal evidenced a desire to commence Todd's education as soon as parental permission was received does not in and of itself indicate that the school came to the October 20 meeting with an immutable, unchangeable, completed plan subject only to parental acceptance or rejection. Additionally, it is "appropriate for agency staff to come prepared with evaluation findings, statements of present levels of educational performance, and a recommendation regarding: annual goals, short term instructional objectives, and the kind of special education and related services to be provided. However, the agency must make it clear to the parents at the outset of the meeting that the services proposed by the agency are only recommendations for review discussion with the parents". (Education for the Handicapped Law Report, Supplement 4, February 6, 1981, p. 103:59)
* * * * * *
After evaluating the relevant information available to me, I have determined that the October 20, 1981 IEP was a valid product of the approved process. The requisite opportunity for parental involvement, crucial to acceptance and implementation of a valid IEP, did exist. The IEP which was prepared prior to the conference was a professional recommendation only; the purpose of the meeting was to discuss the proposals, receive input from any interested parties, and to formulate a final, formal independent education program for Todd.
620 F.Supp. at 1231.
The preceding jurisprudence vigorously promotes parental participation with almost *1166 a singleminded resolve in every phase of the IEP's development and preparation. The F.G.'s disavowed the participatory process after the initial CST meeting at which B.G. was classified P.I. Although they attended a subsequent conference, approximately eight months later, their attendance was purely in response to the ALJ's decision changing B.G.'s classification from P.I. to E.D. Their conduct was impermissible and contrary to the stated purposes of the EAHCA. The precepts of the law are clear and available to all who come forth with a cooperative spirit and an open mind.
The F.G.'s were aware of their right to offer input to the CST. In their disappointment over the proposed IEP's, they lost sight of the process and unilaterally placed B.G. at YBP without prior notice or discussion with the Board. They made no inquiry about the proposed IEP nor did they register any constructive criticism. Equally controlling in the Court's decision is the CST and Board's respect for the procedural safeguards of the F.G.'s. The proposed IEP, though substantively inadequate, was procedurally correct. The substantive inadequacy was legally insufficient to evoke F.G.'s response that "any further contact or effort to request a different placement [would be] a waste of time." The CST at all times was prepared to alter or supplement the IEP if it proved to be ineffective. As Mrs. DePinto, the certified social worker stated, "[t]he program was not written in stone."
When a Court, such as this, is authorized to apply equitable considerations and balance the equities in a particular case, the conduct of the parties is extremely relevant. To the F.G.'s the Youth Behavior Program became an idee fix้. They lost sight of the comprehensive nature of the EAHCA, as well as the remedial conflict resolution measures of the N.J.A.C.[7] They palpably failed on the Alamo factors, and unwisely ignored the Robert B. insights. Conduct that disregards the participatory process cannot be ignored nor condoned. The cross-pollination of ideas between parents and school authorities expresses hope, trust and confidence in the system and inures to the benefit of the child, who is entitled to a free appropriate public education.
The cooperative efforts of parents and school authorities are inextricably intertwined with a handicapped child's inalienable right to a "free appropriate public education." Whoever disrupts that cooperative venture, and thus interferes with the child's rightโwhether it be parents or school authoritiesโdoes so at his or her financial peril.

CONCLUSION
B.G.'s placement at the Youth Behavior Program and the therapeutic intervention he received do not qualify as "related services" under the EAHCA and the N.J.A.C. Further, equitable considerations require a denial of reimbursement.
NOTES
[1] 20 U.S.C. ง 1401(19) provides:

The term `individualized education program' means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, an (E) appropriate objective criteria evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
[2] 20 U.S.C. ง 1415(e)(2) & (3) provides:

(2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
(3) During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.
[3] N.J.A.C. 6:28-1.1(b)(1) reads as follows:

`Related services' for educationally handicapped pupils means counseling for pupils, counseling and/or training for parents relative to the education of a pupil, speech correction, recreation, occupational therapy, physical therapy, transportation, as well as any other appropriate developmental, corrective and supportive services required for a pupil to benefit from education and as indicated in the pupil's individualized education program.
See N.J.A.C. 6:28-3.7(e)(6) as to "other related services as necessary...."
[4] The "stay put" provision attempts to preserve the status quo and to minimize the delay that accompanies disputes over educational programs. It ensures that a school cannot eject a child without complying with due process requirements. Tokarcik v. Forest Hills School District, 665 F.2d 443, 453 (3d Cir.1981), cert. denied, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982).
[5] Many courts have denied reimbursement simply because the voluntary and unilateral placement was not on the state's "approved list" of out-of-district placements. Antkowiak v. Ambach, 838 F.2d 635, 642 (2d Cir.), cert. denied, ___ U.S. ___, 109 S.Ct. 133, 102 L.Ed.2d 105 (1988).
[6] B.G. is currently enrolled as a residential student at Deveraux House.
[7] Though the Department of Education held settlement conferences on July 10, 1986 and April 1, 1987, each occurred after the request for a due process hearing.