**MOHAWK TRAIL REGIONAL SCHOOL DISTRICT, Plaintiff,**

**v.**

**SHAUN D., by and through his next friend, LINDA D., and Massachusetts Department of Education, Defendants.**

**No. 97–30099–KPN.**

United States District Court,
D. Massachusetts.

Jan. 27, 1999.

---

Peter L. Smith, Paroshinsky Law Offices, Springfield, MA, for plaintiff.

Carol Booth, Carol Booth, Burres, Fidnick & Booth, Amherst, MA, Judy Zeprun Kalman, Attorney General's Office, Springfield, MA, for defendants.

*MEMORANDUM WITH REGARD TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 18) and DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 21)*

NEIMAN, United States Magistrate Judge.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et. seq.*, as amended, and Massachusetts General Law chapter 71B charge a local education agency ("LEA") with providing a free appropriate public education to all children with special needs. Mohawk Trail Regional School District ("Mohawk") is the LEA so charged within its jurisdiction. At the time this action commenced, Shaun D. ("Shaun") was an eighteen and one-half year old male residing in Shelburne Falls, Massachusetts. Linda D. is Shaun's mother.

In a decision dated March 31, 1997, the Bureau of Special Education Appeals ("BSEA"), which is part of the Defendant Massachusetts Department of Education, found that the educational plan proposed by Mohawk was insufficient as it failed to make appropriate provisions to address Shaun's behaviors. As a result, the BSEA found Mohawk responsible for Shaun's placement at Whitney Academy, a special education residential facility. Mohawk commenced this action in order to contest those findings. Shaun, Linda D. and the Massachusetts Department of Education have been named as Defendants. With the parties' consent, the case has been assigned to the court pursuant to 28 U.S.C. § 636(c) for all purposes, including entry of judgment.

Presently before the court are the parties' cross-motions for summary judgment. Although the title of their respective motions do not so indicate, Mohawk seeks to reverse the BSEA decision and Defendants seek its affirmance. Having reviewed the entire record and having considered all the issues raised by the parties, the court will deny Mohawk's motion and allow Defendants' motion.

## I. *STANDARD OF REVIEW*

Plaintiff's action is brought under the IDEA as a party aggrieved by the findings and decisions of a state educational agency. In such an action, "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The court does not, however, have "an invitation ... to substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rather, the court must give the state administrative proceeding "due weight." *Id.* See also *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir.1993). To accomplish this, the court must apply "an intermediate standard of review[,] ... a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." *Lenn*, 998 F.2d at 1086. This standard must be applied against the traditional summary judgment standard. *Norton Sch. Comm. v. Massachusetts Dep't of Educ.*, 768 F.Supp. 900, 904 (D.Mass.1991).

## II. *STATUTORY AND REGULATORY FRAMEWORK*

The IDEA was enacted to ensure that all children with disabilities receive a free appropriate public education designed to meet their unique needs. *Kathleen H., Larry H. and Daniel H. v. Massachusetts Dep't of Educ.*, 154 F.3d 8, 10 (1st Cir.1998) (citing 20 U.S.C. § 1400(c)). Under the IDEA, a "free appropriate public education" is defined as "special education and related services." 20 U.S.C. § 1401(18). "Special education," in turn, is defined as:

specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education.

20 U.S.C. § 1401(16). "Related services" is defined as:

transportation, and such developmental, corrective, and other supporting services (including ... psychological services, ... counseling services ... medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education ...

20 U.S.C. § 1401(17). A child in need of special education is entitled to an individualized educational plan ("IEP") which provides for his or her educational development in the least restrictive environment. *See* 20 U.S.C. § 1401 *et. seq.*

■ Massachusetts law parallels the IDEA, although it reflects a more exacting standard. *See* M.G.L. ch. 71B. "A Massachusetts IEP must be reasonably calculated to assure the child's maximum possible development in the least restrictive environment." *Frank S. v. Sch. Comm. of the Dennis–Yarmouth Reg. Sch. Dist.*, 26 F.Supp.2d 219, 226 (D.Mass.1998). It is not enough to provide for an "adequate education." *Id.*

Regulations promulgated pursuant to M.G.L. ch. 71B § 1 define a "child in need of special education" as a child who "because of a disability consisting of a developmental delay as an intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, is unable to progress effectively in regular education and requires special education services in order to successfully develop the child's individual educational potential." 603 C.M.R. § 28.104(a). "Special education" shall consist of "specially designed instruction ... to meet the unique needs of a child in need of special education, including the development of the child's educational potential." 603 C.M.R. § 28.503.1. The term special education includes "instruction conducted in the classroom, in the home, in hospitals and institutions and in other settings." *Id.*

"Related services" include "such developmental, corrective, and other supportive services as are required to assist a child with special needs to benefit from special education." 603 C.M.R. § 28.503.2. "Related services to the child ... shall be provided through the prototype in which the child is placed and shall be directly related to the achievement of the short and long term educational objectives specified in the IEP." *Id.* Related services include, but are not limited to, school health services provided by a qualified nurse or other qualified person, as well as social and psychological services. *Id.* Social and psychological services include, among other specified services, individual consultation, crisis intervention by a school adjustment counselor, social worker, psychologist or psychiatrist, short term crisis intervention and individual counseling. *See* 603 C.M.R. § 28.503.2(g)(1)–(5). Related services also include medical services for diagnostic and evaluative purposes. 603 C.M.R. § 503.2(h), (i).

A student's IEP is developed by a "TEAM." Under Massachusetts law, the term "TEAM" describes a group of individuals who develop, review and revise the provisions of an IEP. *See* 603 C.M.R. § 28.314.0 *et seq.* A similar group is required under federal law. *See* 34 C.F.R. § 300; 343–44. *See also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 988 (1st Cir.1990). "Once promulgated, an IEP must be reviewed annually and revised when necessary." *Roland M.*, 910 F.2d at 988 (citing 20 U.S.C. §§ 1414(a)(5), 1413(a)(1)(11); 34 C.F.R. § 300.343(d); M.G.L. ch. 71B, § 3).

### III. *FACTUAL BACKGROUND*

There are no real genuine disputes of fact. When he was about eight years old, Shaun was removed from his biological home by the Massachusetts Department of Social Services ("DSS") due to abuse and neglect. (Administrative Record ("A.R.") (Docket Nos. 9 and 10) at 7.) In June of 1993, he moved to Shelburne Falls and was placed by DSS with

Linda D. and her husband (the "Ds"). The Ds became Shaun's pre-adoptive family. Previous recorded diagnoses of Shaun in DSS records included post-traumatic stress disorder, obsessive-compulsive disorder, suspected fetal alcohol syndrome, static encepalopathy, pedophilia, paraphilia disthymic disorder, mild mental retardation and head trauma. (A.R. at 7.)

Just prior to his placement with the Ds, Shaun underwent a neuropsychological evaluation with Dr. Judith Souweine in March of 1993. (A.R. at 166–75.) Dr. Souweine found that Shaun displayed a good understanding of basic everyday experiences and social rules. She recommended that, when Shaun entered high school, he be placed in a self-contained special education program combining academic and pre-vocational emphases. (A.R. at 174.)

Shaun was initially placed in a "substantially separate program" at Mohawk Trail Regional High School under an IEP, dated September 7, 1993, developed by Shaun's TEAM.[1] The program, called a 502.4 prototype, was accepted by Linda D. (A.R. at 7.)[2] An amendment to the IEP, dated September 30, 1993, noted that Shaun adjusted well to Mohawk and proposed his continued placement in the substantially separate program, together with speech, language, counseling and special transportation services. The amendment was accepted by Linda D. on October 26, 1993. (A.R. at 8.)

In early May of 1994, Shaun's TEAM convened for an annual review, but had to immediately reconvene on May 10, 1994, after Shaun inappropriately touched a student confined to a wheelchair. (A.R. at 8.) The TEAM thereafter proposed an IEP which was accepted by Linda D. The IEP noted that Shaun had recently begun counseling with Duncan Laird of Franklin Clinical Associates, with a focus on sex and health. Pur-

suant to the IEP, Shaun was to have an "adult supervising him, within eyeshot, at all times, with some flexibility that will be determined by Shaun's teacher." (A.R. at 8.) On November 21, 1994, Shaun's IEP was amended again, this time with regard to speech and language objectives: "He will have adult supervision at all times until this is no longer necessary." (A.R. at 8.) The amendment was accepted by Linda D. on November 30, 1994. (A.R. at 8–9)

Shaun's TEAM reconvened on May 23, 1995, and again on June 8, 1995. (A.R. at 9.) Representatives of the Massachusetts Department of Mental Retardation were present at the meeting. The TEAM proposed a continuation of the same 502.4 prototype program, including the identical adult supervision requirement as the previous IEP, even though Shaun had acted appropriately in school all year. (A.R. at 9.) However, on July 17, 1995, Linda D rejected the proposed IEP and requested that the TEAM reconvene as soon as it received an educational evaluation from the Franklin Medical Center. (A.R. at 255.) Shaun had been referred to the Franklin Medical Center by DSS and at the request of Linda D. in order to plan changes in his therapeutic and educational regimen. (A.R. at 9–10.)

The Franklin Medical Center evaluation, which had been undertaken in June, noted the Ds' concerns about Shaun's acting-out behaviors and his need to be monitored at all times. (A.R. at 9.) "According to Mom, were it not for his sexual difficulties, they would see him as having no significant problem." (A.R. at 263.) The evaluation reported that, outside of school, Shaun acted "like the opposite sex," exhibited a preference for dressing as a woman, stared at children and acknowledged his difficulty in restraining his sexual behavior, especially towards young boys and girls. The evaluation also reported that

---

1. A "substantially separate program" has the following characteristics, among others,
   (a) The child shall be assigned to program or programs made up entirely of children in need of special education.
   (b) In each program the number of children for each teacher shall not exceed eight, and for each teacher with an aide, shall not exceed twelve. . . .

603 C.M.R. § 28.502.4. Prior to coming to Shelburne Falls, Shaun received special education services in substantially separate programs in both Williamstown and Easthampton, Massachusetts. (A.R. at 7.)

2. 603 C.M.R. § 28.502.0 sets forth various prototypes, 502.1 through 502.10, for Massachusetts special education programs.

Shaun had made "significant progress both academically and in adapting to living on the Ds' family farm." Nonetheless, the evaluation recommended that, given his "significant sexual disorder," which manifested itself in sexual preoccupation and sexually abusive behavior directed primarily at young children, consideration be given to residential placement until Shaun's pedophilia was brought under control. (A.R. at 10.)

The TEAM at Mohawk was also provided a risk assessment developed by Emily Coleman, a social worker, during the summer of 1994. In a letter to the Ds dated May 19, 1995, Ms. Coleman referred to a case conference held on August 31, 1994, and opined that Shaun had difficulty controlling his sexual impulses, was at risk for sexually acting out behavior and should not be left unsupervised with children. (A.R. at 9.)

Shaun's TEAM reconvened on September 7, 1995, and recommended a continuation of his 502.4 prototype program, together with a number of related services. (A.R. at 256, 275.) The proposed IEP also provided that "Shaun will be under the direct visual supervision of a responsible adult at all times." (A.R. at 225.) Linda D. rejected the IEP on October 26, 1995. (A.R. at 275.)

In the meantime, on September 8, 1995, Mohawk wrote to the Ds and explained that mainstreaming would occur pursuant to weekly sessions between the Ds and Shaun's teacher. (A.R. at 286.) Mohawk also sent a release to the Ds to authorize the school to communicate with Dr. Ross, Shaun's primary care physician. There was no response.

Shaun was hospitalized at the Franklin Medical Center from September 11 through 19, 1995. (A.R. at 10.) His psychiatric discharge summary of September 27, 1995, revealed that Shaun was anuretic, had sexually assaulted at least six children and had stopped eating. (A.R. at 289.) The treating psychiatrist indicated that Shaun suffered from "pedophiliachronic ongoing issues" and noted that the Ds had not contacted Shaun during his stay on the unit. "Ms. D. was mad at Shaun" and "overwhelmed by his problems." (A.R. at 289.)

After his discharge, Shaun was referred to the Tri–County Family Stabilization Team. Tri–County's treatment plan of October 25, 1995, described Shaun as a "sexually deviant youth" who needed "treatment in an intensive residential setting." (A.R. at 11.) Despite the intervention of Tri–County, Shaun's behavior out-of-school continued to deteriorate over the fall and early winter of 1995–1996. (A.R. at 275.) However, Shaun continued to make progress in school and demonstrated growth in appropriate peer relations. (A.R. at 275, 352.)

Shaun last attended Mohawk Trail Regional High School on January 12, 1996. On January 17, 1996, the Ds initiated a child in need of services ("CHINS") petition pursuant to M.G.L. ch. 119 because they were not able to maintain the level of supervision Shaun required. (A.R. at 11.) As a result, Shaun was committed to the custody of DSS. Thereafter, DSS, without Mohawk's knowledge or participation, placed Shaun at the Brightside Acute Residential Treatment Center, where he was in residence until April of 1996.

During Shaun's placement at Brightside, William Hickey, Mohawk's Administrator of Special Education, stated in a letter to DSS that it was Mohawk's position that Shaun "has and can be successful in public school" and that Mohawk "was able to meet his educational needs and address his behavior in-school." (A.R. at 313.) Nonetheless, on April 4, 1996, DSS, without Mohawk's knowledge or participation, placed Shaun at Whitney Academy ("Whitney"), an approved residential school in East Freetown, Massachusetts. Whitney runs a program for mentally retarded students who have sexually offending behaviors, that is, all behaviors leading up to and including actual sexual offenses and assaults. (A.R. at 12.) Whitney and the Ds developed a residential prototype program under 603 C.M.R. 28.502.6. Shaun's goals and objectives at Whitney included increasing his academic functioning, developing functional life skills and implementing an effective relapse prevention plan. (A.R. at 12.) Educationally, Shaun received twenty-four and a half hours of academic, life skills and pre-vocational services

per week. He was placed in the lowest academic level classroom relative to his peers and needed to be seated away from certain students for their safety. (A.R. at 107–128.)

Shaun's Mohawk TEAM reconvened on September 13, and again on October 28, 1996. (A.R. at 319.) Whitney's program director was invited to the meetings, but did not attend. In its new proposed IEP, the TEAM noted that Shaun had consistently appeared happy at Mohawk, was motivated to do well and was well liked and cooperative. (A.R. at 320.) Despite developmental delays, the IEP continued, Shaun showed progress in all academic areas and supervised work experiences, enjoyed appropriate social interactions with peers in school, and responded well to simple verbal prompts. Accordingly, the TEAM again proposed a 502.4 prototype, together with consultative and direct special education and related services. The new IEP also provided for an extended school year and special transportation. (A.R. at 322.) Psychological services included speech, language and occupational therapy, health education, and a 1:1 aide. It was this proposed IEP which became the subject of the administrative hearing before the BSEA and, in turn, the matter now before the court.

At present, Shaun remains at Whitney as a residential student.

## IV. ADMINISTRATIVE LEVEL ACTION

In a thirteen page decision, the BSEA hearing officer, Reece Erlichman, addressed three issues which the parties stipulated were presented by the case:

(a) Whether the specific services needed to address Shaun D's pedophilia and paraphilia fall under the definition of special education services under state and federal law and the regulations promulgated thereunder?

(b) Whether Mohawk['s] ... proposed 502.4 IEP will provide for Shaun's maximum feasible educational benefit, or the least restrictive environment consistent with that goal? .

(c) If not, whether the 502.6 placement at the Whitney Academy will provide the maximum feasible educational benefits for Shaun D. in the least restrictive environment?

(A.R. at 7.)

Relying in part on *David D. v. Dartmouth Sch. Comm.,* 775 F.2d 411 (1st Cir.1985), the hearing officer determined that the IEP proposed by Mohawk "fail[ed] to make appropriate provision for services to address Shaun's sexually acting out behaviors" and, accordingly, was "not reasonably calculated to provide for his maximum possible educational development." (A.R. at 13.) The hearing officer also found that Whitney's educational plan "addresses Shaun's sexually acting out behaviors, and further offers him academic services equivalent to those proposed in Mohawk's IEP," and thereby "provides for his maximum possible educational development in the least restrictive environment consistent with that goal." (A.R. at 13.) As a result, the hearing officer concluded, Mohawk was responsible for Shaun's residential placement at Whitney.

## V. DISCUSSION

Defendants maintain that the hearing officer's findings are adequately supported by the record and should be affirmed. Mohawk, in contrast, asserts that (1) the specific services and treatment necessary to address Shaun's pedophilia and paraphilia fall outside the definition of special education services under both federal and state law, (2) its IEP ensured Shaun's maximum feasible educational benefits in the least restrictive environment, and (3) the present matter is "fundamentally distinguishable" from *David D.* Mohawk also argues that the hearing officer's decision fails to consider the fact that DSS violated not only its own regulations, but the Operations Protocol between DSS and the Department of Education.

### A.

■ Mohawk contends that the hearing officer's decision unfairly mandates that Mohawk assume the burden of treating Shaun's behavior through his placement at Whitney. "Given that Shaun's pedophilia and paraphilia did not interfere with his ability to make effective academic, social and vocational

progress," Mohawk argues, "the BSEA was arbitrary in further directing that Mohawk address issues which were and are out of its control and which it does not, or should not, be expected to provide intervention." (Pl. Mem. (Docket No. 19) at 16.) "The premise that everything that is done to or for an individual is an educational activity," Mohawk continues, "is contrary to the intent of federal and state law governing the provision of education to children with special needs." (Id.) Mohawk goes so far as to argue that, if the court were to embrace the regulatory scheme as interpreted by Defendants, "all angry and aggressive behavior outside of school, including murder, rape, gang violence, drug related activity, assault and battery, robbery, kidnapping, and sexually inappropriate behavior, which did not affect the child's educational performance, would become the responsibility of local school districts." (Pl. Reply Mem. (Docket No. 26) at 5.)

Were the issues as broad as Mohawk fears, the court would have significant sympathy for Mohawk's concerns. Special education laws are not designed to cure all of society's ills; nor do they mandate that schools solve all ailments which, unfortunately, inflict our children. As the First Circuit recognized over fifteen years ago, in passing the IDEA, then known as the All Handicapped Children Act, "Congress did not intend to burden local school committees with providing all social services to all handicapped children." *Abrahamson v. Hershman*, 701 F.2d 223, 228 (1st Cir.1983). Rather, the requirements of special education laws must be evaluated on a case-by-case basis. *Id.*

Like the child in *Abrahamson*, Shaun presents a unique case. His out-of-school behavior was not only related to various recorded diagnoses, but was inextricably intertwined with his educational performance. As in *Abrahamson*, Shaun's need for residential care, as determined by the hearing officer, came about "only upon finding that the minimal educational benefits to which [Shaun] was entitled could not be obtained in a day program alone; rather the kind of training he needed had to be given round-the-clock, thus necessitating placement in a residential

facility." *Id.* Giving due weight to the BSEA decision, the court believes that the preponderance of the evidence adequately supports the decision.

### B.

Massachusetts regulations require that schools provide services which "are specially designed ... to meet the unique needs of a child in need of special education, including the development of a child's educational potential." 603 C.M.R. § 28.129.0. In addition, schools are mandated to provide related services, defined as "... such developmental corrective and other supportive services as are required to assist a child in need of special education to benefit from special education." 603 C.M.R. § 28.503. These related services include but are not limited to vocational, health and therapy services, as well as social and psychological services.

It is undisputed that Shaun is a child in need of special education. Shaun suffered abuse and neglect in his biological home and has a long list of recorded diagnoses, including but not limited to post traumatic stress disorder, obsessive compulsive disorder, suspected fetal alcohol syndrome, pedophilia, paraphilia and mild mental retardation. Together, these diagnoses reflect disabling physical, emotional, developmental and psychiatric conditions which are explicitly covered by the Massachusetts regulations. The regulations entitle a child to special education services when the child, "because of a disability consisting of a developmental delay or an intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof is unable to progress effectively in regular education and requires special education services in order to successfully develop the child's individual educational potential." 603 C.M.R. § 28.104(A).

As Defendants assert, emphasizing the "combination thereof" regulatory language, Shaun's disabilities touch on nearly every one of the conditions specified in the regulations. He has a developmental delay, intellectual, neurologic and emotional impairments, as well as language, communication and physical disabilities. In addition, as Defendants

argue and as the hearing officer found, Shaun's emotional disability is particularly complex. Every practitioner who has examined Shaun has found his combination of disabilities difficult to remediate. For example, Emily Coleman, who evaluated Shaun in 1994, found that Shaun not only had "difficulty controlling his sexual impulses," but also had "cognitive distortions justifying sex offending behavior, has inadequate knowledge of sexuality and poor interpersonal skills with peers." (A.R. at 67.) It is this combination of behavioral, emotional, cognitive and organic factors which forms the unique contours of Shaun's special education profile.

An emotional disability will entitle a child to special education services if his or her "capacity to manage individual or interactive behaviors is limited, impaired, or delayed and is exhibited by difficulties which persist over time and in more than one setting in one of the following areas: the ability to understand, build, or maintain interpersonal relationships; the ability to react/respond within established norms; the ability to keep normal fears, concerns, and/or anxieties in perspective; the ability to control aggressive and/or angry impulses of behavior." 603 C.M.R. § 28.104. Shaun's disability, which has persisted over time and in more than one setting, fits nearly every one of these defining characteristics. The record reveals Shaun's extremely limited ability to understand, build and maintain interpersonal relationships. He also has had a limited ability to control his aggressive impulses and his sexually inappropriate behavior reflects an inability to react and respond within established norms. Mohawk itself acknowledges that "[t]here is no dispute that Shaun cannot function by himself and requires close supervision." (Pl. Mem. at 16 .) Given this record, the hearing officer found Mohawk's proposed educational plan for Shaun inadequate because it failed to provide services to fully address these offending behaviors.

## C.

Despite the findings of the hearing officer, Mohawk maintains that Shaun is not entitled to educational and related services to address his sexually offensive behavior. In so arguing, Mohawk equates educational services with academic services and educational progress with academic progress. In addition, Mohawk asserts, Shaun "does not need a residential program in order to achieve educational benefit." (Pl. Mem. at 16.) Mohawk's proposed IEP, it insists, more than adequately met the requirements of federal and state law.

■ In the court's opinion, the law does not support the delineation which Mohawk seeks to draw, particularly in the case of a severely impaired student like Shaun. " 'The concept of education is necessarily broad with respect to' some severely or profoundly retarded children." *Abrahamson*, 701 F.2d at 228 (quoting *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 693 (3rd Cir.1981)). Similarly here, Shaun had educational goals and objectives which were not simply academic in nature. As the First Circuit acknowledged, such educational goals can relate to behavioral controls and other nonacademic tasks. *Abrahamson*, 701 F.2d at 227–28. Given Shaun's unique combination of needs, special education services may reasonably include counseling and therapy, the very services offered by Whitney, but not by Mohawk. (A.R. at 64–65.)

Interestingly enough, Mohawk itself historically defined Shaun's educational needs as including the very goals and objectives which it now claims are excluded under its more limited definition of educational services. Each of the previous IEPs developed by Mohawk included goals and objectives related to Shaun's need to develop appropriate peer relationships, (A.R. at 183, 241, 333), and to interact with peers in a socially and physically appropriate way. (A .R. at 242, 253, 333.) In addition, these IEPs called for Shaun to develop "socially acceptable conversation and physical contact," and to "gain[ ] information about maintaining friendships and what is acceptable behavior within these relationships." The hearing officer found that it was "critical" that Shaun's IEP include these goals and that Mohawk could not avoid addressing them fully.

As Defendants note, however, the IEP developed by Mohawk during the course of the BSEA appeal eliminated the majority of

goals related to Shaun's social, emotional and behavioral problems. As justification, Mohawk asserts that Shaun had demonstrated growth in these areas. (*See* Pl. Mem. at 17 n. 6.) However, as Defendants point out, Shaun was not in school at Mohawk during much of the previous year and had not been a student at Mohawk for over ten months at the time Mohawk wrote its last IEP. Thus, Mohawk had little knowledge on which to base its finding that Shaun had grown sufficiently so as to no longer need special education services in those areas.

Still, Mohawk asserts that Shaun made sufficient progress on his social goals and objectives while at Mohawk as to make the more restrictive placement at Whitney unnecessary. Indeed, the parties stipulated that Shaun made academic and vocational progress at Mohawk, as well as progress in activities of daily living. (A.R. at 64 ¶ 25.) More specifically, Mohawk argues, it did not need to address those aspects of Shaun's offensive behavior which manifested itself outside the school setting.

In response, Defendants argue that Shaun's continuing offensive behavior provides compelling evidence that he had not made sufficient progress on his social goals and objectives. No student can be seen to have achieved any goal, academic or otherwise, Defendants argue, if he is unable to perform the same tasks in the community as in the classroom. Mohawk, Defendants continue, cannot help Shaun understand his inappropriate behaviors, or teach him acceptable behavior, merely by ensuring that he does not reoffend while on school grounds.

Were it not for Shaun's unique situation, Defendants' noble premise, that a child's educational goal must give him the ability to generalize what he learns at school to the community, might sweep too broadly. However, as described, Shaun not only presents a unique situation but, in accord with the IEPs which Mohawk itself previously formulated, had educational goals which went beyond simply preventing the reoccurrence of sexually offensive behavior. Those goals included his understanding appropriate social conduct and forming appropriate peer relationships. (A.R. at 332–33.) [3]

■ There is no evidence of record which indicates that simply preventing Shaun from physically touching other students would accomplish these enumerated goals. Rather, the evidence, at least at the time of the BSEA decision, indicated that the services Shaun needed to accomplish his goals could only be met at Whitney. Since Mohawk did not have a program at the time which could provide the services, the BSEA's ruling that Whitney was the appropriate placement cannot be deemed either arbitrary or capricious. *Compare Frank S.,* 26 F.Supp.2d at 227, 231 (school's IEP, rather than residential school sought by child's parents, satisfied requirements of IDEA). As the First Circuit has directed, "[t]he ultimate question for a court under the [IDEA] is whether a proposed IEP is adequate and appropriate for a particular child at a given point of time." *Town of Burlington v. Dep't of Educ. for Comm. of Mass.,* 736 F.2d 773, 788 (1st Cir.1984).

### D.

■ Mohawk argues that Shaun's placement at Whitney amounted to treatment of "an underlying medical (psychiatric) condition." (Pl. Mem. at 15.) To determine if a service is a related service under the IDEA or beyond its scope, a court must first determine whether the service is a "supportive service[ ] . . . required to assist a child with a disability to benefit from special education."

---

3. The educational services needed to address Shaun's offending behaviors were described by experts who evaluated Shaun. Those services included: "learning self control," (A.R. at 67), having "an intellectually disabled group of his peers who also have sexual problems," (A.R. at 67), "consideration of group residential placement . . . ," (A.R. at 87), "enhancing his social/emotional/behavioral functioning toward the self-motivated development and implementation of an effective offense relapse prevention plan,"

(A.R. at 109), "maintain(ing) optimal health . . . by recognizing and seeking assistance for increasing depression/obsessive-compulsive behavior," (A.R. at 110), "develop(ing) functional life skills that will support successful community integration," (A.R. at 115), and "utilization of healthy coping skills, as evidenced by the maintenance of appropriate behavior and absence of various inappropriate sexual behaviors." (A.R. at 133.)

20 U.S.C. § 1401(17); *Irving Independent Sch. Dist. v. Tatro,* 468 U.S. 883, 890, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). If it is, the court must then determine if the service is excluded from the definition of supportive service as a medical service beyond diagnosis or evaluation. *Tatro,* 468 U.S. at 890, 104 S.Ct. 3371.

Mohawk's arguments to the contrary, the provision of psychiatric treatment does not easily fall within the medical services exclusion under federal and state law and does not transform Shaun's placement at Whitney into something other than educational. Granted, those courts which have considered the issue of an LEA's responsibility for placement in a residential program for children diagnosed with a psychiatric disorder have come to varying conclusions. The courts have taken into account a variety of factors, including whether the placement was made initially to treat an acute episode of mental illness, whether the student was stable when the placement was made, whether the residential placement was in a facility certified by the state as a special education placement, *Doe v. Anrig,* 651 F.Supp. 424, 431 (D.Mass.1987), whether the services provided at the residential program furthered IEP goals, *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings,* 903 F.2d 635 (9th Cir. 1990), whether the primary focus of the program was a "cure" or whether the focus was on providing special education services in a therapeutic setting. *Papacoda v. State of Connecticut,* 528 F.Supp. 68 (D.Conn.1981).

■ These factors weigh in favor of Shaun's placement at Whitney. First, Shaun's diagnosis, as described, cannot be summarized by one simple medical term. He has not only been diagnosed as having pedophilia, paraphilila and mild mental retardation, but other emotional, social and behavioral conditions with which these diagnoses are intertwined. When a residential placement is made necessary by a combination of problems, the LEA may be found financially responsible for the placement. *See Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114 (2d Cir.1997); *Papacoda,* 528 F.Supp. at 71. It is difficult to fully understand, as Mohawk argues, how Shaun's paraphilia and pedophilia should or could be treated separately from his retardation and other behavioral problems.

Second, when Shaun was in acute psychiatric distress, DSS placed him at the Brightside Acute Residential Treatment Center. Only when his condition had stabilized was he placed at Whitney. It was then that the Ds pursued funding for the placement. (A.R. at 63–64.) As described, Whitney is an approved educational facility for students with disabilities like Shaun's. It is uncontested that the services Whitney provides further the goals of his IEP.

Third, there is no suggestion in the record that Shaun was placed at Whitney to receive medical services. Federal regulations define "medical services" as "services provided by a licensed physician." 34 C.F.R. § 300.13(b)(4). Given that definition, Shaun receives almost no medical services at Whitney. As Defendants note, Shaun receives some medication, presumably prescribed by a physician, but all other services are provided by teachers, a nurse, a school psychologist and other school personnel. (A.R. at 129–41.)

### E.

Basing the decision "upon a preponderance of the evidence presented and the decision of the First Circuit in *David D.,*" the hearing officer found the facts presented here "virtually indistinguishable" and concluded that Mohawk's IEP failed "to make appropriate provision for services to address Shaun's sexually acting out behaviors, [and was] not reasonably calculated to provide for his maximum possible educational development." (A.R. at 13.) *See also David D.,* 775 F.2d at 411. Mohawk's argument to the contrary, the hearing officer's reliance on *David D.* was not misplaced.

The First Circuit determined that David D.'s educational services needed to include those necessary to "learn[ ] the self-control essential to living in the mainstream community...." *David D.,* 775 F.2d at 416. Neither the District Court nor the First Circuit focused primarily on where the offenses took place, as Mohawk contends.

Rather, as the hearing officer recognized in the present matter, the *David D.* decision was grounded on the parties' acknowledgment that "... social and personal skills including sex education are part of David's special education needs ..." and the experts' conclusions "... that David needed a comprehensive, 24 hours, highly structured special education program that would address his social and behavioral needs in a consistent way by a trained staff throughout his waking hours." *Id.* The First Circuit spent very little time addressing whether the offending behaviors took place in the school or the community. If anything, the First Circuit explicitly affirmed that part of the District Court's decision which found that, although David's behavior was better in school than other settings, the school was still responsible for remediating the sexually inappropriate behavior which threatened David's ability to be successful in the community. At bottom, although the frequency, intensity and location of Shaun's behavior differ, the hearing officer drew an appropriate analogy between *David D.* and Shaun's case.

### F.

■ Despite the court's conclusion that the hearing officer's decision is otherwise sustainable, Mohawk's concern about DSS's actions in this matter is not without merit. Mohawk asserts that, in unilaterally placing Shaun at Whitney, DSS failed to abide by its own regulatory obligations. As a result, Mohawk maintains, it was left inappropriately with the financial responsibility of that placement.

The requirements of the IDEA and the regulations promulgated thereunder apply to all political subdivisions of a state, including state agencies. 34 C.F.R. § 300.2.(b). When a state agency, other than an LEA, places a child in a residential facility, the agency must ensure that it is in compliance with the "least restrictive environment" provisions of the IDEA and, further, with the requirement that the placement of each child with a disability (1) be determined at least annually, (2) be based on the child's IEP, and (3) be as close as possible to the child's home. 34

C.F.R. § 300.552(a). Similarly, DSS regulations obligate the agency to provide substitute care when parents are unable to care for a child in their own home. 110 C.M.R. § 1.03. Those regulations further provide that, except in emergencies, "where a child's service plan will affect the child's educational development, the Department ... shall consult with the child's school system in the development of such plan ... prior to placement." 110 C.M.R. § 4.65.

The Operations Protocol between DSS and the Massachusetts Department of Education similarly obligates DSS to consult with a child's school system when developing that child's service plan. Rather than doing so, DSS, with the cooperation of the Ds but without prior notice to Mohawk, unilaterally placed Shaun at Whitney. Moreover, although required, DSS never discussed Shaun's placement at Whitney with Mohawk for over five months after his enrollment. *See* 110 C.M.R. § 7.403(3). Similarly, DSS did not, as required, refer the matter to the Office for Children for resolution by the interagency's services team concerning which agency or department was responsible for providing services to Shaun. *See* M.G.L. ch. 28A § 6A; 110 C.M.R. 7.011. Given this set of facts, it is not surprising that Defendants concede that DSS violated the Operations Protocol.

The practical effect of the violation, however, is not clear. Once the hearing officer decided, on March 31, 1997, that Whitney was the appropriate placement, Whitney became the "then current educational placement" within the meaning of 20 U.S.C. § 1415(e)(3) and Mohawk was required to maintain that placement pending this court's review. *Sch. Comm. of Town of Burlington v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 372–73, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In fact, as the court has been given to understand, Mohawk has assumed financial responsibility for Shaun's placement at Whitney since that time.

The court also understands, however, that as a result of its ruling upholding the hearing officer's decision, Mohawk could be deemed responsible for the costs of Shaun's placement at Whitney prior to March 31, 1997, as

well. Granted, the parties appeared to agree at oral argument that there was little likelihood that DSS would seek reimbursement for those costs. After the CHINS petition was allowed and DSS was granted custody of Shaun on January 17, 1996, DSS assumed financial responsibility for Shaun's placement until he reached his eighteenth birthday, March 5, 1997, and then through March 31, 1997, the date of the BSEA decision. *See* M.G.L. ch. 119, § 39G(c). DSS's lack of interest in pursuing reimbursement for those costs may well be related to its failure to abide by the Operations Protocol. Still, there is no guarantee that DSS will not seek reimbursement from Mohawk for the costs incurred at Whitney prior to March 31, 1997.

■ In addition, the court is not necessarily convinced, as Defendants argue, that Mohawk is simply in the same position as if the Ds, rather than DSS, made the unilateral placement at Whitney. *See Burlington,* 471 U.S. at 373–74, 105 S.Ct. 1996 ("Parents who unilaterally change their child's placement . . . without the consent of . . . local school officials, do so at their own financial risk."). Given the regulatory framework, DSS's financial obligations may not disappear merely because a court confirms that its unilateral placement was not inappropriate. Of course, as guardian of a child, DSS is no less responsible for cooperating with school officials than parents. *See David D.,* 775 F.2d at 424 (IDEA embodies preference for educational decisions arrived at through "good faith cooperation and negotiations among the parties"). However, in light of its regulatory obligations, DSS may be even more obligated to cooperate and bear the financial costs for not doing so. *Cf. B.G., by F.G. v. Cranford Bd. of Educ.,* 702 F.Supp. 1158 (D.N.J.1988) ("Conduct that disregards the participatory process cannot be ignored nor condemned. The cross-pollination of ideas between parents and school authorities expresses hope, trust and confidence in the system and inures to the benefit of the child, who is entitled to a free appropriate public education. The cooperative efforts of parents and school authorities are inextricably intertwined with a handicapped child's inalienable right to a 'free appropriate public education.' Whoever disrupts that cooperative venture, and thus interferes with the child's right—whether it be parents or school authorities—does so at his or her financial peril."). Query as well whether the costs of a unilateral placement may be avoided by DSS merely because the child thereafter turns eighteen.

Despite the spirit of the regulatory framework, it is perplexing that Mohawk raises its concerns with respect to DSS so forcefully now, when it does not appear to have done so before the BSEA hearing officer. Yes, in its written submission to the hearing officer, Mohawk argued that DSS's placement of Shaun at Whitney violated the Operations Protocol and asserted that the full cost of Shaun's residential placement at Whitney should be borne by DSS. (A.R. at 21, 38–40.) However, the three specific issues which Mohawk presented to the hearing officer, (A.R. at 21), which issues were re-articulated in the BSEA decision, (A.R. at 7), did not address the DSS matter at all.

Upon the court's inquiry at oral argument, Mohawk, through counsel, asserted that the hearing officer had the power to implead DSS during the administrative hearing process. When asked by the court if he had made such a request, counsel indicated that he had not. As a result, DSS is not a party to the instant litigation and the court, despite its sympathy for Mohawk's position, has no grounds upon which to explore the matter more fully. Consequently, the central issue in this case remains the underlying BSEA decision, not the hearing officer's failure to consider Mohawk's argument that the Operations Protocol may have been breached by DSS.

## VI. CONCLUSION

For the reasons explained, the court believes that the decision of the hearing officer with respect to Shaun's placement at Whitney should be affirmed. This does not necessarily mean that Shaun's placement at Whitney remains viable and appropriate today. That issue, however, is neither before the court nor necessitates remand. Accordingly, the court will allow Defendants' motion and deny Mohawk's motion.

A separate order shall issue.

*ORDER*

For the reasons stated in the accompanying Memorandum, Plaintiff's Motion for Summary Judgment (Docket No. 18) is hereby DENIED and Defendants' Motion for Summary Judgment (Docket No. 21) is hereby ALLOWED.